Bland, Chancellor.
It is certain, that in all cases where an attachment from this court is in the nature of mesne process; or where, as in this instance, it has been issued, upon an exparte affidavit, for a contempt, of which the party may clear himself by answering interrogatories, or shewing cause, the sheriff may take bail for the party’s appearance; and although the sheriff is not bound to take bail, yet if he does do so, he may sue and recover upon the bail bond, in case the party should fail to appear, (a) Upon a return of cepi corpus, the course in England, now is, to send a messenger to bring him before the court; (b) but here, as formerly in England, and as in cases at common law, the sheriff may be ordered to bring in the body, (c) In this instance, *102 no bail having been taken, the party is before the court in custody, and, therefore, to obtain a discharge from confinement, has a right to have his case heard before any other matter now ready to be presented to the court.
But considering this attachment as being, in reality, nothing more than an auxiliary to the injunction, the judgment upon it may be much better adapted to its chief purpose after, than before the court has determined, whether the injunction shall be continued or not; since it is obvious, that if the injunction should be dissolved, nothing will be left, under the attachment, but the bare contempt; whereas, if the injunction should be continued the court may order the party to remove any injurious work he may have erected, after the service of the injunction, as a part of the punishment, under the attachment.
Upon which the solicitors of the plaintiff, at once, waved all claim to have the attachment enforced, in any other respect, than as an aid of the injunction; and consented, that the two subjects should be considered together; and that the attachment should abide the fate of the injunction. With this understanding the case proceeded upon the motion to dissolve the injunction; and the bill and answers were read and explained.
*103 8th August, 1829.
Bland, Chancellor.
It appears, and is now admitted, that the body politic, called ‘ The Chesapeake and Ohio Canal Company,’’ has not been made a party to this suit; and therefore, it will be proper, at once, to declare, that on that ground alone, this injunction must be dissolved, and the attachment quashed. But as the solicitors of the parties have come prepared to discuss this motion upon its merits, it may be better for all concerned, that the argument should proceed as if there were no errors in the pleadings; or as if the facts, now disclosed, were presented in such a form as the parties were willing to abide by; only so far noticing the present defects in the pleadings as to enable the court to say to what extent they require amendment. Because if the plaintiff stops here with a mere order that the injunction be dissolved ; and immediately asks for an amendment of his bill, the Chancellor will expect a full and frank discloure of all the facts of the case, as now developed by these erroneous proceedings, and will use his discretion in granting or withholding a new injunction accordingly.
The solicitors of the parties entirely approved of these suggestions, and the argument of the case proceeded accordingly.
22d September, 1829.
Bland, Chancellor.
The motion for the dissolution of the injunction heretofore granted, standing ready for hearing, and the solicitors of the parties having been fully heard, the proceedings were read and considered.
A writ of injunction is one of the strong arms of the Court of Chancery, which is seldom put forth, in any case of magnitude, Without being most sensibly felt. This great conservative power, iih some form or other, seems to be an essential part of our code, f there were no means of instantly arresting any one, who should be seen moving with a most wicked speed to the perpetration of an irreparable depredation upon the property of another, our laws would be materially defective. And yet, on the other hand, if, upon any light pretext, the movements of a citizen might be suddenly checked, or any large and costly concern might be at once brought to a stand, and its operations restrained, for any length of time, positive ruin might be produced by the very means intended for preservation and protection. Therefore, on a bill for n injunction, or a ne exeat, though the court will act with a romptness almost amounting to surprise, care must be taken, that application be made as promptly as possible. If the object *104 be to stop the erection, or further operation of a large and costly work, it should appear, that the application has been made as soon as the party became apprised of his rights, and the extent of the injury with which they were threatened; or, at least, it must not appear, from the bill itself, that there had been any express or tacit admission or acquiescence not properly accounted for. (d) A court of equity frequently refuses an injunction where it acknowledges a right, when the conduct of the party complaining has led to the state of things, that occasions the application; (e) or, in other words, it grants or refuses an injunction, in many cases, not upon the ground of the right possessed by the parties; but upon the ground of their conduct, and dealing before they applied to the court for an injunction to preserve and protect that right. (f)
If the equity of the bill be of a very dubious character; or if it appears, from the magnitude, nature, and exigency of the case, that the defendant should have an early opportunity of relieving himself from the restriction, he is always, as in this instance, apprised of it, by an order, sent with the writ, allowing a motion to dissolve to be heard with or without answer; or on some short notice after filing the answer, (g) The only mode, now in use, of obtaining an injunction is by a bill; which should state a case of a plain right, which is in probable danger of being irreparably injured, or altogether defeated unless the injunction be granted as prayed; or in some other more suitable form. The truth of the facts set forth in the bill should be verified by the affidavit of, the plaintiff; or, as in this instance, by his agent, if he be not a resident of the state; or the Chancellor must, in some other manner, be induced to trust the bill for the truth of its statements; (h) cor an injunction may be granted, on the equity admitted by the an-\ swer after it comes in, although the bill has not been sworn to. (i)
An injunction bill, and indeed every other bill, whatever may be ' its nature, or object, assumes two propositions; first, that the subject of it is of an equitable character, such as falls within the *105 jurisdiction of a court of equity; and next, that the parties to whom the claim is alleged to belong, and against whom the relief is, if any, to he granted are all called by it before the court. If the bill be substantially deficient in either of these particulars, it may be shewn at any time; either as a ground for dissolving the injunction, or at the final hearing; when the bill maybe dismissed at once, or be permitted to stand over with leave to amend, and make proper parties, if it may be inferred, from what then appears, that there,are merits which may be brought before the court.(j)
This bill states that the plaintiff, Amos Binney, (is seized in his own right, and as trustee for others, of certain land,’ to which the irreparable injury complained of is about to be done; that is, Binney and others complain of an injury threatened, or about to be done to their property. But who are those others, or cestui que trusts ? They are no where named, or in any manner made parties to this suit; nor does it appear, whether Binney holds with them • as joint tenants, tenants in common, or, if they hold in severalty, how their respective parts are situated with respect to each other, and with respect to the river. Yet, from the nature of the right claimed, and the injury complained of, as we shall presently see, it is important, that all this should substantially appear, to enable the defendant to meet the case with such a defence as the law may entitle him to make, as well as, that the court should be enabled to give relief in a manner commensurate to the rights, and suited to the claims of the plaintiffs respectively, or collectively. The bill distinctly informs the court, that there are others who have an interest in the land as well as Binney; and yet it no where names them. They, therefore, cannot have their interests precluded, or bound by any decree, as parties to this suit. There are cases in which a trustee may sue alone; but it is very clear, that this is not one of them; and that, in this instance, it is indispensably necessary, that the cestui que trusts should be named and made parties. If they refuse to join Binney as plaintiffs, he may, to obtain the separate relief to which he is entitled, make them defendants. This objection might have been waived; and Binney’s separate claim to relief, so far as it could have been shown, or, to a certain extent, might have been admitted. But upon this occasion, the defendants have specially relied on this as one of their objections.
By an act of assembly authority was given to create, or call into *106 active existence a corporation by tbe name of The Chesapeake and Ohio Canal Company, with power to sue and be sued by that name.(k) But, from the peculiar nature of such an artificial body, it can be made a party to a suit in no other manner, than by its designated legal appellation; because it can, in no other way, be noticed by a court of justice, or made known to the law. Its name is the very being of its constitution; the knot of its combination, without which it can perforin none of its corporate functions.(l) No body, whether natural or artificial, can be treated as a party defendant against whom no process is prayed. Merely naming a person in a bill as a defendant does not make him a party, unless process is prayed against him,(m) nor can an injunction be granted against any one unless it be expressly asked for by the bill, (n)
This bill alleges, and repeatedly charges, that The Chesapealce and Ohio Canal Company, have withheld, and are about to injure the rights of the plaintifF. The nature of the wrong, and the means by which it is to be effected, are described; and all the injustice which has been, or may be so produced, is clearly and expressly imputed to The Chesapeake and Ohio Canal Company, as the chief actor, and moving cause of all. Eveiy one else complained of is distinctly described as an officer or agent of that corporation. The bill, however, prays, that an injunction may be directed, not to that corporation, but ‘ to the President and Directors of the Chesapeake and Ohio Canal Company and Isaac McCord aforesaid, their engineers, agents, and servants, and- all others engaged by said President and Directors.’ And without asking for any process, calling on the corporation, named The Chesapeake and Ohio Canal Company, to answer, as a defendant; the bill, after naming the persons who were then President and Directors, only prays for a suhpcena ‘ to the said President and Directors and Isaac McCord, commanding them to appear and answer.’
Hence it appears, that the body politic itself has not been *107 made a party to this suit; and that no injunction has been directed to it; and consequently no restriction has been, or can be imposed upon its conduct; nor can any order, or decree which has been or can be passed upon this bill, in any manner control, affect, or bind it, or its rights, interests, or property. The whole cause of complaint is against the corporation; and therefore, it is evident, that the relief, to be at all effectual; whether by an injunction, or in any other shape, must be imposed upon and directed against the corporation specially complained of, as the cause of the alleged wrong. It would be fritile to bind up the hands, and give relief against the servant while the master was left free. And so, in this instance, it would be of no service to this plaintiff, and insure to him nothing of the substantial relief he seeks, by enjoining the present officers and agents of this body politic; since, in doing so, the court would employ its powers against improper objects; and therefore ineffectually. For, if the present officers and agents were restrained, others might be instantly employed, so as immediately to prosecute the alleged mischievous work. And the judicial authority would have gone forth, not to prevent wrong, but to induce a corporation to change its officers and agents, which would be idle.
Upon these grounds, and because of this palpable defect in the bill, the injunction, which issued in pursuance of its prayer, could not be sustained in any way whatever. Yet this corporation, called The Chesapeake and Ohio Canal Company, might have treated this defect in the bill as a mere misnomer of itself; and by appearing and answering by its proper name, it might have waived all right to take advantage of the error. (o) But it has not done so; and its officers by their answer expressly rely and insist upon this objection to the bill.
The plaintiff might, it is true, have asked and obtained leave to amend his bill in this particular; and the injunction would not, as of course, have been dissolved on making any trivial, or unimportant amendment. But where an amendmant is asked for the purpose of introducing new facts, which give a different complexion to the case, or make any substantial alteration in it; or where the object of the amendment is, as in this instance, to bring before the court the principal mover of the alleged wrong, so as to require a *108 new frame and direction to be given to the writ of injunction itself; there the very prayer for such an amendment carries with it a tacit admission, that the basis of the injunction, which had been previously granted, is substantially wrong; and therefore, upon granting the amendment the injunction is gone of course, unless expressly saved by the terms of the order granting the amendment. (p)
This bill has, however, not only omitted to bring before the court, those who, it appears from its statements, have an interest in the claims and pretensions set forth; and also that body who is charged to be the cause of all the alleged injury; but it has brought before the court certain persons, who in the capacities in which they stand here, have not the least interest in the matter in controversy; for, where the’legal capacities of parties are different, such capacities must be considered as if they were several persons, (q)
It is stated, that ‘ Charles F. Mercer, is the president of the said company, and Joseph Kent, Andrew Stewart, Peter Lenox, Frederick May, Walter Smith, and Phineas Janney are the directors of the said company; ’ and a writ of subpoena is prayed against the said president and directors ; so that, by this description of person, those individuals have been called here, in their natural capacities, to answer this bill. But, in those capacities, they have no interest in the matter, as is manifest, from the very sum and substance of the charges; and therefore, they ought not, as such, to have been made parties; and if they had, on that account, demurred to the bill, their demurrer must have been sustained.(r) It appears that Isaac McCord has no other concern with this matter than as a contractor with, or agent of The Chesapeake and Ohio Canal Company; and yet a subpoena has been expressly asked for against him by name; and he has been brought here as a defendant. Agents and servants of the principal may be served with the injunction and made to obey it; but they should not be made parties to the suit. Persons who stand thus uninterested in the matter in controversy cannot be made parties to the suit. Where a person who has no interest in the matter has been improperly associated with others as a defendant, the bill may be dismissed as to him, with costs; *109 without prejudice to the case as regards all others. But it happens, unfortunately, in this case, that if the bill were to be dismissed as against these defendants, who have no interest in the-case, there would be no defendant in court, and the whole suit would be totally broken up.
Where there are a plurality of defendants, they may join in making answer to the bill, or they may answer separately, or they may make a joint and several answer as best suits their convenience or' pleasure. But, in- whatever form the response may be couched, it is essential, if not waived by the plaintiff, that each defendant should swear to his answer; and therefore, when an answer purports to be the answer of two or more, and is not sworn to by all, it may be taken off' the file, or can only be received as the answer of him who has sworn to it. (s)
In this instance, it appears, that on the 21st of July last, an answer was filed, which purports, and is set forth in the beginning, to be c The separate- answer of the President and Directors of the Chesapeake and Ohio Canal Company 7 who, by this description,, on reference to the bill, are determined to be £ Charles F. Mercer,. the president of the said company, and Joseph Kent, Andrew Stewart, Peter Lenox, Frederick May, Walter Smith, and Phineas Janney, the directors of the said company.’ But, of all those seven persons whose answer it purports to be, it has been sworn to by Charles F.. Mercer only. It can, therefore, be received, at most, as being no more than his answer alone; and so taken, it appears, that the other six persons have not, as yet, answered at all. Hence, according to the general rule, this motion for a dissolution could not be sustained upon the answers of only two of these defendants; unless it should appear, that the defendants who had not answered, had neither any interest in, or material knowledge of the matter; or that their answers might be dispensed with for some special reason, (t) But, in this instance the interest, and the knowledge of those directors, it is evident, must be, to the full, as extensive as those of Mercer and McCord; and, consequently, there is no reason why this plaintiff should not have the benefit of all their answers, before he is called upon to shew cause why he *110 should not be made to part with his injunction; if his bill were in all respects such as to give him a just claim to its continuance.
On the 21st of July last, Isaac McCord filed his answer, in which, after stating that he had contracted with this company to execute certain work; and otherwise very imperfectly answering the bill; apparently with a view to make up for the insufficiency of his answer, he says, ‘he made a contract with them as stated in his answer to the petition of the complainant; to which he refers, and which answer he prays may be taken as a part of this his answer to the bill of complaint. A reference to the same will render it unnecessary for this defendant to give a particular answer to the charge in the bill.’
It is presumed, that this defendant meant by this to refer to and invoke as a part of his answer to the bill, the answer which he had, or rather intended to have given to the petition, praying for an attachment against him. But, on referring to the answer which he actually made to that petition, it appears, that it was not sworn to until the 28th day of the same month; nor filed until the 3d day of August following. It is therefore evident, that, although this mode of malting an answer sufficient, by referring to, and adopting an answer of a co-defendant, or by splicing on to it another answer belonging- to a different subject, may be tolerated to a certain extent; (u). yet here, the dates of the affidavits and filing of the papers demonstrate, that it has not, in fact, been done. And, consequently, this answer of McCord, taken without the aid of the matter invoked, affords, to him and his co-defendants not the slightest ground for dissolving this injunction.
Having thus reviewed the- pleadings, I shall now gather up the facts, as stated in them, and their respective exhibits; and inquire, whether they present any equity which merits a more decent garb, or which ought to be allowed to come again before the court in an orderly manner. And overlooking the errors of the pleadings, I shall, in speaking of the parties, consider Amos Binney as the plaintiff, and The Chesapeake and Ohio Canal Company as the defendant.
In the bill, and its exhibits, it is alleged, that Amos Binney is seized in his own right, and as trustee for others, of certain lands situated adjoining to the little falls of the Potomac river, partly in Maryland, and partly in the District of Columbia, beginning at the *111 head of the little falls, and extending down along the river; which property is naturally possessed of great and peculiar advantages, in the application of water to mills; for which purpose the plaintiff, and all others, owning lands so situated, have a right to use the waters of the river; that the plaintiff is entitled to certain rights and privileges, under the act of 1784, ch. 33, s. 13, which The Chesapeake and Ohio Canal Company deny, oppose, and prevent him from being let into the enjoyment of; although they have succeeded to the rights, and have subjected themselves to the claims and franchises which were demandable from the body politic incorporated by that law; although the canal, made under the authority of the act of 1784, has had admitted into it a sufficiency of water both for navigation and water works, as is evident, from the quantity of waste water now thrown off, in various sluices upon the land of the plaintiff; and although this plaintiff is able and willing, and has offered to agree to contribute to enlarge the canal for the purpose of letting into it an additional supply of water, if it should become necessary.
It is further stated, that the plaintiff is a stockholder in The Chesapeake and Ohio Canal Company, the President and Directors of which body politic have commenced and are now engaged in the work of extending the canal, for the making of which their act of incorporation was passed, from a point on tide water, called the old locks, two miles above Georgetown, and easy of access to any sea vessel which can reach Georgetown, to the city of Washington without any legal authority whatever; and to avail themselves of a power they claim of disposing of waste water from the canal, have purchased lands on its illegally extended line below the lands of the plaintiff with an intention to erect water works; or solely with a view to subserve local interests, and to speculate in lands, mill-sites, and water privileges; which illegal extention of the canal, and purchase of land are designed to work a fraud upon the interests of the plaintiff; first, by materially and irreparably injuring, or destroying the natural advantages peculiarly incident, and belonging exclusively to his land, and constituting its chief value; secondly, by materially and irreparably injuring or destroying the rights secured to him by the act of 1784, ch. 33, s. 13; thirdly, by irretrievably depreciating the value of his mill-sites by the* formation of others, adjoining to them, along the line of the illegally extended canal; and lastly, by expending the funds of the body politic,/ including a portion of that which belongs to this plaintiff, as a! stockholder, in a way not authorised by their act of incorporation.!
*112 It is further stated, that the plaintiff is debarred from the use of ■his property, and threatened with still greater injury by The Chesapeake and Ohio Canal Company, who are erecting an immense dam, abutted on his land, in Montgomery county, and extending entirely across the river, and of sufficient dimensions to obstruct the whole •of its waters from their accustomed channel, and to divert them entirely away from his lands; and thus totally destroy the advantages, for mill-sites, which they naturally possess; and also to deprive him of his rights under the act of 1784, ch. 33, s. 13. All which has been done, or is about to be done by the defendants, without the consent of the plaintiff; without his having been compensated for his property; and without its having been valued and condemned in any manner according to law.
In the answers and their exhibits, it is alleged, that the body politic, created by the act of 1784, ch. 33, had, by virtue of their .powers, acquired a right to land in Montgomery county, at the place in question; and had erected thereon a dam across the river, which is to give place to the one now complained of; that the proposed dam is neither to be abutted, nor erected on any part of the plaintiff’s land; that the old canal, from the old dam downwards, was twenty-five feet wide, and two feet deep; and, these defendants, having resolved to use it, without any enlargement, as a feeder to the new canal; deemed it necessary, in order to furnish a sufficient supply of water to the new canal, to raise the new dam four feet higher than the old one; so as to pass into that portion of the old canal, designed as a feeder, a depth of six feet of water. And it is further alleged, that the proposed elongation of the new canal, and the mode of supplying it with water, have been determined upon with a view to the uses for which the canal was specially designed; and to those reservations, in the acts incorporating these defendants, in favour of Maryland, Virginia, and Congress; and, likewise, with a view to such other uses as were not then, but which might thereafter be allowed to be made of the water thus introduced into that end of the new canal; and these defendants did, accordingly, petition the several legislatures for the privileges, denied to them in their charter, of applying the surplus water in the canal to manufactories; and they now claim the right to sell and dispose of the waste water; wherever wastes shall be essential to the security of their canal; and it is positively denied, that the whole of the waters of the river, or even one tenth part of them, at their most reduced summer volume, can be diverted by the dam, *113 which the defendants are now erecting, and passed through the feeder into their new canal.
And it is further alleged, that the old locks, from which the extension of the canal complained of is to be made, are below the dam; and within the District of Columbia; and consequently, that the whole of the extension of the canal, charged to be illegal, is beyond the jurisdiction of this court; that the proper termination of the canal is a matter which, by the act of incorporation, belongs exclusively to these defendants alone; and has been accordingly determined upon by the company at a full meeting of the stockholders, convened for that and other purposes; and moreover, that, after it had thus been determined upon, the matter was brought before the Circuit Court for the District of Columbia, and the judgment of that court pronounced thereon; which judgments of the body politic and of the Circuit Court are final and conclusive upon the matter, as against this and all other tribunals.
Bills of injunction are always submitted to the chancellor ex parte, and most commonly asking relief under some pressing emergency? which admits of little or no delay. It is not always practicable, thus, to obtain a clear view of the ease from the bill alone; the haste, negligence, or unskilfulness with which it has been framed often leaves a mist hanging over a part of the case where light is most wanted; nor is it easy, in every instance, at once, to look through the mazes of a complicated case, so as either to appreciate the merits of the plaintiff’s pretensions at their full worth, or to detect their infirmities, and want of equitable support. Under such circumstances, if there appears to be strong and plausible reason to believe, that the plaintiff has a just claim to relief, I have always deemed it best to grant the injunction, because for the purpose of obtaining an injunction, it is sufficient that the case be important and doubtful; (w) and at the same time to give the defendants, as in this instance, an opportunity of having its propriety reconsidered as soon as possible, (x)
Passing by the informalities of the pleadings, there appear to be three distinct subjects presented to the court for investigation. First, the plaintiff’s claim to certain natural mill-sites which, it is alleged, are in danger of being irreparably injured or destroyed. Secondly, the plaintiff’s claim to certain artificial mill-sites, derived from the defendants’ canal, which also, as it is alleged, are in like imminent danger — and, Thirdly, the illegal and unauthorised expen *114 diture of the funds of the body politic, by its President and Directors, to the great prejudice and irreparable injury of the plaintiff, who is one of the stockholders thereof. A careful examination of these three subjects will carry us over all the causes of complaint now brought before the court.
The plaintiff alleges, that he is the owner of certain natural mill-sites, which are in danger of being ruined by the defendants; and, therefore, he asks to have them protected. Natural mill-sites differ according to the form of using water as a propelling power. But here the kind of natural mill-sites claimed are sufficiently designated by describing them, as being situated on the margin of the river Potomac, above tide water; and where the river is a rapidly deseen-' ding stream. It follows, therefore, that the kind of mill-sites spoken of are those where machinery is propelled by falling water. So much of this case depends upon having a just conception of a mill-site of this kind, that I deem it proper to be particular in the description of it; and, since truth is often more readily and effectually conveyed to the mind by the eye, than by the ear; I have thought it best, for the purpose of giving a more distinct explanation of this matter, to subjoin the following figure or diagram. (y)

Let the line A C represent the margin of the declined plane of the bed of the stream over which the water continually pours from A toward the tide at 7; and let B represent a position on the land, elevated twenty feet above the water at C. Now, to constitute such a natural mill-site as is claimed by the plaintiff in this case, it is necessary, that it should be practicable to conduct the water from the stream at A, to the position B, and there cause it to propel mill machinery by its fall from B to the level of C. The line A B, in mill-sites of this kind, will represent the head race; and *115 the line B C the tail race; and consequently, a natural mill-site, on the margin of any gradually descending river or stream, must always convey to the mind the idea of a portion of land described by straight, or curved lines, as from ABC, with a pitch or fall from B to C, equal to that of A C. The length of the head or tail race is, comparatively unimportant; it is enough, that they be practicable; nor is it of any consequence what is the height of the pitch, or the quantity of water tumbled from B to C; it is sufficient, if it be so high, and so much as to propel the machinery of a mill. It follows, from this view of the subject, that every such situation, on the margin of a running stream of water, is a mill-site, of the kind of those claimed by this plaintiff. And, if water enough can be brought from A to B, and there is room at B for building two or more mills; then there may be said to be on that portion of land just so many natural mill-sites.
One natural mill-site may exist outside of another. Let the plane of the descending stream, as before described, be followed up to 1; and then extending the head race thence to the mill position at 5; and the tail race to the stream at 7; and there will be represented what may be called, in reference to the stream, and to each other, an inner and an outer mill-site. Again, one natural mill-site may exist above another; thus, suppose the head race of the upper mill to begin at A, that it is stationed at 4, and discharges its water, by a tail race, at 9; and that the lower mill occupies the ground 8 10 C.
Now these several mill-sites, when owned as the separate property of individuals, carry with them certain incidental rights; each one has a right to the use only of the descending water; and consequently, he can neither divert, nor consume it; nor use it to the prejudice of another. And therefore a dam cannot be raised, A 2, so as to catch and divert the whole stream from 1, and carry it to the outer mill at 5, and pass it off at 7, leaving none, or not enough to be taken at A to propel the mill at B. Nor can the lower mill owner be allowed to raise the water in the stream, by a dam 8 6, so as to cast it back to 3, and flood the wheels of the upper mill at 4.
But, a natural mill-site may exist, as any other thing may exist in. nature, without being the separate property of an individual. Hence, in making out a claim to a natural, unimproved mill-site, the party must shew, not only, that it exists, but that he is the owner of it. The whole of the land described by the lines ABC *116 .is necessary to constitute a natural mill-site; and therefore, unless an individual owns the whole of that land, he cannot be considered as the owner of the mill-site. Thus, suppose, that portion of this land included within the lines A 4 9, belonged to X; and, that another portion, included within the lines 8 10 C, belonged to Y; and the residue to Z; it would be perfectly evident, that neither of the three persons could be said to be the owner of the mill-site; because neither could encroach or trespass upon the other; and a portion of the land necessary for the head and tail race being cut off, from the only suitable position for the mill, neither of them could be considered as the owner of a mill-site.
This distinction between the natural existence of a mill-site, and its being the separate property of an individual has been long expressly recognized, even in our statute book; as is shewn by the act of assembly which declares, that any person who may be desirous of building a forging mill upon land, next adjoining to any run of water, of which he is not the owner, may obtain from chancery a writ of ad quod damnum ; and have it, to the extent of one hundred aeres, condemned to him for that purpose, (z)
The plaintiff alleges, ‘that he is seized in his own right, and as trustee for others, of certain lands, situate adjoining to the little falls of the Potomac river, partly in Maryland, and partly in the District of Columbia, beginning on the river at the head of the little falls, and extending downwards; which property is naturally possessed of great and peculiar advantages in the application of water to mills.’
This is the whole, and the best description of the-mill-site claimed by the plaintiff, that I have been able to collect from the proceedings, It may be admitted, that he is seized in his own right, and as trustee for others; but how, and where the- lands are- situated which he claims as his own, or which he holds as trustee for others does not appear., A mill-site is a separate and entire thing, incapable of division; the land, of which it is naturally constituted, may be held In joint tenancy, or in common; but the moment it is divided and taken in severalty, the ownership of the mill-site is gone, although its natural existence remains. It may be- true, as alleged, that the several parcels of land of which Amos Binney and others áre the separate owners, when taken together, may have great advantages in the application of water power to mills; and *117 yet, that no one of the several owners of the lands, when taken in the separate parcels in which it is held, be entitled to any one mill-site. And this, there seems to be good reason to believe, is the real truth of the case.
From, the plot, filed as the defendant’s exhibit B, it appears, that the lands, lying between the head of the little falls and the tide, were granted by the statej in many distinct parcels; and most probably to different grantees. The several tracts, called ArelVs Folly ; Addition to ArelVs Folly ; Jacob ; Resurvey on Jacob ; and White Haven; besides other parcels, not named, are represented as lying along, the river between the head of the little falls and the tide. From the plaintiff’s printed exhibit A, it would appear, that the mill-site, lying on the margin of the river, from the head of tide upward, belonged, in the year 1770, to one John Balendine ; that he sold it to Way,,Paxson and Cloud; all, or one of whom held it about the year 1784 ; that, prior to the year 1816, it had passed into many other hands; that it then became vested in two persons; then in a family; and then the plaintiff purchased one-fourth. And, in some loose marginal notes on another plot, marked as the defendant’s exhibit B, some of the land along the river, from the head of the little falls to tide,, is said to be, at present owned, or claimed in separate parcels by the claimants of ArelVs■ Folly, and the claimants of Jacob, in distinct pieces; by William Stewart, by William Murdock, and by Adam Cloud’s heirs. The defendants do not admit that the plaintiff is entitled to a' mill-site on any part of this land; and, therefore, as in such case, the plaintiff must set forth and sustain his title by proof, it would be impossible to pronounce, from the pleadings, if they were ever so- clear in representing only these facts, that the plaintiff was entitled to any mill-site, lying on any part of the river shore within the jurisdiction of this court.
But, let it be supposed, that the plaintiff, had set forth, and sustained his title to a mill-site. The next inquiry is, as to the kind of danger with which he alleges it to be threatened. It must be recollected, that the mill-site thus .claimed, must lay below the head of the little falls; because he claims no land above those falls. The injury, against which he asks protection, he says, will be produced by the dam, which the defendants are erecting across the river Potomac, four feet above the present surface. But this dam is on the very upper point, as he alleges; or, as the defendants allege, entirely above his land; and, consequently, he cannot, in anyway, *118 be injured as the holder of an upper mill-site, by' casting back the water, and flooding his works, or diminishing his fall of water. This, I conceive to be perfectly manifest from the description given of an upper and a lower mill-site. But, to recur to the diagram for illustration, the plaintiff alleges, in effect, that the dam complained of is as at A, and being raised to 2, will divert the whole óf the water of the river from 1 to 5, and let it into the tide at 7; by which his mill-site A. B. C. will be totally destroyed.
Taking this view of the subject, the plaintiff, according to his own shewing, must be' considered as the owner of the- inner mill-site; and the defendants of the outer one. And, supposing them to be alike entitled to the use of the water, it is undeniably true, that the defendants can have no right, so to divert if as to diminish the value of the plaintiff’s mill-site; much less to destroy it. On adverting to the prodigious extent of the country drained by the Potomac, above the point where 'this dam is to be placed, it must strike every one, as very extraordinary, if true, that a dam, four feet high across the river, at that point, should be sufficient to divert the whole of its waters through a canal-of only six feet in depth, and twenty-five feet in width. But the fact is positively denied. It is said, that not more than one-fifteenth part of the waters of the river, at its most reduced summer volume, can be so diverted by this darn. And, therefore, the fact, on which this part of the plaintiff’s complaint is grounded, being untrue, the complaint itself is deprived of its. only just foundation. For if the plaintiff’s mill-site, be, as he alleges, constituted of the situation A. B. C. and he finds water, át.the commencement of his head race in sufficient abundance for all the purposes'of his mill-site, he can have no possible cause of complaint; however high, or in whatever way the projected dam across the river may be formed, (a)
But the plaintiff- alleges, that his mill-site is likely to'be depreciated in value, almost to nothing, or totally destroyed by the unlimited rivalships of new milhsites; which the’defend ants will create by their projected dam across the river. Again recurring to the diagram for illustration, this complaint is to this effect:. .The dam A. 2. will enable the defendants to conduct the water of the river from l.to 5; and, consequently, all that space of land between that head race and the river, below the plaintiff’s' mill-site A. B. C. *119 may be formed into mill-sites, outside of his and in ruinous rival-ship of it. This cause of complaint, it is believed, however, assumes a principle of law for its basis, which has hitherto never been gravely proposed to be acted upon by any one; much less sanctioned by any of our courts of justice. It is said, in some of the English books, that a new market, or ferry shall not be set up so near an ancient one, as to draw away its custom. But it is no nuisance or wrong for one man to erect a mill so near to that of another as to'draw away its custom; or to enter into competition with it in any manner whatever, (b)
« Supposing then it were true in point of law’, as it is not, that the defendants could lawfully appropriate their canal, from 1 downwards, to the purpose of a head race to a closely set row of mills for several miles long, below, and outside of the mill-site of the plaintiff; still, as their doing so would be lawful, the plaintiff would have no legal cause of complaint, on the ground of the depreciating effect thereof upon his mill-site. If the state grants a patent and induces people to lay out a great fund, it would, as has been said, be wrong to grant a rival patent wantonly. (c) But it would be bad policy, unjust and unconstitutional, as having the effect of a monopoly, to prevent any one from making any use whatever of his own property, because of its operating as an injurious rivalship of another who was not thereby in any way hindered from making a similar or any other use of his property.
But, supposing all that has been said, in relation to the plaintiff’s legal rights to certain natural mill-sites, to be entirely erroneous; and, that those claims are in all respects valid; then it follows, from what he himself has stated, that the land, or a portion of it, which is necessary to constitute those mill sites, lies in the route of the proposed canal, and is about to be occupied by it. If so, it is certain, that it may be condemned for that purpose in the manner prescribed by the act of Assembly, (d) And in the valuation, so directed to be made, all its worth, whether inherent, or incidental; its value arising from its fertility and mineralogical contents, as well as its value arising from its affording mill-sites or its peculiar suitableness for any other purpose, should, and no doubt would be duly considered and estimated under the inquisition and condem *120 nation. Therefore, even if the plaintiff has his natural mill-site taken from him by these defendants for their canal, he has a legal and proper remedy, and cannot be relieved in this way. Besides, it is declared by .that act of Assembly, ‘that the pendency of any proceedings in any suit, in the nature of a writ of ad quod damnum, or any other proceedings, shall not hinder, or delay the progress of the work.’ (e) And, consequently, this court would not interpose, in any way, further than to compel these defendants to institute and prosecute with reasonable diligence proceedings, in the nature of a writ of ad quod damnum, under this law, so as to enable the plaintiff to obtain the redress specially provided for him; unless there were some fraudulent circumstances; or some deviation from the line prescribed, or going beyond the authority given. (f)
From all these considerations and views of the subject, it is certain, that it has not been distinctly shewn, that the plaintiff is the owner of any natural mill-site; between the point where the defendants are. erecting their dam, and the tide water of the river— and even if he is the owner of any such mill-site, the acts imputed to the defendants, being either denied as untrue to the extent set forth; or being in themselves legal, are not of such a nature as to form the foundation of any complaint against them by this plaintiff^ as the owner of such natural mill-site. ’ ■
The next stand taken by this plaintiff is upon the privileges, which, he alleges, have been secured to him by the act of assembly ■ incorporating The Potomac Company, upon whose estate these alleged privileges were charged; (g) which company were, for certain considerations, authorised to convey to The Chesapeake and Ohio Canal Company, all the property, rights and privileges by them owned, possessed, and enjoyed; and the new company were enabled to accept such transfer, and to hold, possess, use and occupy all the property, rights and privileges in the same manner, and to the same effeet as The Potomac Company had held, and occupied the same by law. (h) And, upon this conveyance being made, The Potomac Company was to be vacated, annulled, and dissolved. This last solemn testamentary act of The Potomac Company, it is admitted, has been properly made, and that body politic has expired *121 and is now no more. (i) It is also admitted, that The Chesapeake and Ohio Canal Company, as the devisee or purchaser of all the estate of The Potomac Company, can only take and hold subject to all the incumbrances of which the title deeds of that company, that is, the acts of Assembly by which they were incorporated gave them notice, by their being specified therein, (j) And, consequently, if this plaintiff can establish his claim against the estate of the defunct, it must be allowed and sustained as equally available against these defendants, who have taken subject thereto.
Supposing that act of incorporation, (k) without having guaranteed any thing like a monopoly in favor of the plaintiff as against any one, to have secured to him the water rights to the lull extent of his pretensions; then they amount to no more than to a right to so many mill-sites as can be laid out upon his land, so far as it lies along the river, and is conterminous with the canal, constructed under the authority of that act, and nothing more — conceding, for the present, the correctness of this claim, the next inquiry is, whether-the acts imputed .to the defendants can do any such injury as is complained of. " -
The plaintiff claims to have the canal considered as the head race to his mill-sites. The projected dam, which the defendants are constructing, it is perfectly manifest, even if it should divert every drop of water from the original-bed of the river into it, cannot, in that way, do his property any harm; because all the water which he claimed the right to use, would be thus poured into the head race of his mill-site. Nor can the raising of this dam four feet higher be of any injury to it; on the contrary, it must be beneficial ; because, instead of giving him the command, as he now has, of a head of only two feet of water, he will have six feet in his head race — and so far as the defendants may have a right to conduct the water, by means of their canal, to mill-sites outside of, and below that” owned by the plaintiff, it will be seen, that every principle of law, shewn to be applicable to a natural mill-site, bears with equal force upon those of the description claimed by the plaintiff — and, therefore, unless he can shew, that the defendants, as owners of outer mill-sites, have so diverted the water as to leave not the usual quantity for his use, he has no cause of complaint. But, that is not alleged or pretended. Therefore, upon these *122 grounds, this subject of the plaintiff’s complaint might be, at once, dismissed as utterly without foundation.
But, the plaintiff contends, that these rights have not only been reserved to him by this law, but have been secured to him, as' against The Potomac Company, and those claiming under them, as a monopoly; which, it is alleged, is about to be irreparably depreciated or destroyed, by means of the dam proposed to be erected by the defendants, by enabling them to create mill sites, which they may hereafter sell, and cause to be improved, with the leave, hereafter to be obtained, from the. legislature; or-, that by increasing the volume of water in the canal, they , will be enabled to multiply the number of its wastes, and thereby add to the number of mill-sites created, in depreciation, and to the ruin of the plaintiff’s monopoly.
It would seem to be a sufficient answer to this cause of complaint to say, that it is founded upon an assumption, that certain remote and contingent events are now approaching, and must happen, in consequence of the erection of this dam by the defendants ; but which, it is obviouá, may in fact never come to pass, or certainly not in the injurious manner complained of. The first of these events, thus referred to, is, that'although the defendants have now no manner of right to create mill-sites'', or to use the water of the canal for any other purposes than navigation’; yet, that, if they are allowed to erect this dam, and prepare for such an use of its waters, some future legislature may be induced to suffer them to do so to the ruin of the plaintiff’s rights. This may happen. But this court is bound, in due respect to the legislature, to presume, that they will, by no act of theirs, authorise, or sanction injustice, or deprive any one of his property, unless it be for the public good;, nor even then without due compensation. (l)
As to the multiplication of wastes from the canal of these defendants, for the sinister purpose of selling them as mill-sites, it would appear to be enough to say, that the act incorporating the defendants, declares, that the water of only such wastes shall be sold as *123 mill-sites, as £ shall be essential to the security of the said canal, and in no other situation whatever.’ (m) When this' clear and positive restriction shall have been, or may be attempted to be violated by any thing, done with that view alone, which is not now alleged, or pretended, it will then be time enough to apply to a court of justice for redress, either by way of remuneration or prevention, (n) Therefore, at present, and in the form in which this cause of complaint is set forth, it forms no just ground for granting or continuing an injunction.
It appears, however, from the proceedings, that this claim of the plaintiff’s under the act incorporating The Potomac Company, (o) is one which he has brooded over, and cherished for years past; and, although, as it would seem, he had never before, in any way, submitted it for the judgment of a court of justice; yet, that he had repeatedly urged it in other forms, and in the most solemn manner. If well founded, it is a claim, that may soon become a grievous perennial draft upon a large navigable high-way, common to this state .and its southern neighbor; it is one which has been deduced from the upper portion of a great and valuable river, belonging altogether to this state, and forming its southern boundary; and it is one which has been interwoven with the longest and most important line of artificial navigation ever sanctioned or participated in by this republic. The plaintiff asserts his right, under this law, as to a privilege of a high and almost inestimable value, and the defendants oppose the claim, as a pretension utterly groundless; but which, if sustained, would become an incumbrance so vast, as to be destructive of the great work upon whose vitals it proposes to fasten and to feed. All these circumstances give to this claim an importance far more than ordinary; and exhibit it as one which,, on every account, requires a most carefulexamination and deliberate consideration in all its connexions and bearings.
The Potomac river, it has been urged, must be regarded as a public navigable river far above tide; and as the common property and highway of the two states between which it is a boundary.. In proof of its navigable character; it has been said, that so long ago as during the war of 1756, it was aseended, as high as Cumberland, by boats carrying a portion of the military stores of Braddock’s army; and has frequently since been navigated in the same *124 manner, and to the same extent, (p) But, I apprehend, that the proof of a few such instances, in which small boats have been dragged up against the stream, through a portion of it, would not be deemed sufficient to give it the character of a navigable highway.
' The Thames and the Severn, two of the largest rivers of England, which perhaps do not together pass a volume of descending water more than equal to. that of the Potomac, are still deemed navigable streams above tide; and that, because although their currents may be rapid and their swells considerable, they are ordinarily navigated with so much ease and safety both up and down, that for time immemorial, and long before there was any such thing as a navigable canal in that country, there were towing paths along spaces of their margins, recognized by custom and by statute law, by -means of which boats "were drawn along by men or horses. (q) .
/ Compared with those gently flowing streams the Potomac is a I torrent; collecting its waters far west, from the rude mountain and high plashy glades; and swelling occasionally from fifteen to thirty feet, comes tumbling down through rocks abrupt, in a manner throughout, and at all seasons with a speed, and in some places with a headlong pitch, that holds in utter defiance every thing like navigation; except it may be in a few calm spaces. The documents, surveys, and plots submitted in this case exhibit the character of this river, iri these respects, in a very striking point of view, (r) I, therefore, cannot think, that it was originally regarded as a navigable river through any portion of it, above tide, until it had been expressly recognized and declared, to some extent, to be so by a positive legislative enactment; (s) but even a navigable river is not a highway in the most extensive sense of the term, (t) The act incorporating The Potomac Company seems, however, to be conclusive as to this point; it is entitled can act for establish *125 ing a company for opening and extending the navigation of the river Potomac.’ The avowed object of which, as appears by all its provisions, was to create a navigation where there was none before, (u) And the act incorporating The Chesapeake and Ohio Canal Company, in providing for the transfer of the right of property, from the one to the other of those companies, in this newly created navigation, declares, that the corporation shall ‘keep the corresponding part of the river in a proper state for navigation, and in as good order as the same now is.’ (w) These laws are the legislative enactments of Maryland and Virginia; and therefore, may be considered as the solemn recognitions of both, that this river, above tide, was not to be deemed, in all respects, a public navigable highway. And looking to the line of navigation to be created; and not to the river alone, the act incorporating The Potomac Company, declares, ‘that the said river, and the works to be erected thereon, when completed, shall forever thereafter be esteemed and taken to be navigable as a public highway,’ (x) not that the river itself and alone shall be so considered.
By the common law, a river not navigable in' its natural state, if it shall be made so, by public authority, shall ever after be deemed a public highway; (y) but this river alone has not been made navigable and declared to be a highway. Taking this then, to be a private river not navigable, it follows, that the riparian holders of land would have an undoubted right to use the water in any manner, without injury to others, (z) And this right is expressly recognized by the act incorporating The Potomac Company, (a) But even supposing this to be a navigable river, and a highway, still the riparian holder of land would have a right to the use of its waters, with only one additional restriction; and that is, that he should not hinder, or injure the navigation. (b)
It was urged, that whatever may be the natural character of this river, above tide; and however it may have been regarded before the year 1785; that the compact made between this state and Virginia, on the 28th of March of that year, has finally established its *126 character, as a navigable river and highway, common to both states, (c)
The general scope and object of that compact was, not to fix and give a legal character to any natural subject whatever; in that respect it did not profess to alter, or to stipulate for anything; throughout it speaks of waters, which are by nature navigable; and regulates the terms and manner in which the natural navigation is to be conducted by the citizens of the contracting parties. The first nine articles cannot possibly be applied in any other way. The tenth establishes certain regulations respecting piracies, crimes, and offences, and for any violence, injury, or trespass, to or upon the property, or lands of the other adjacent to the said bay or river, &c. Piracy is a name given to no offence committed within the body of a county; but only to crimes upon bays and rivers, or any tidewater, considered as an arm of the sea, not within the body of a county; but originally and properly within the jurisdiction of the admiralty. This provision respecting piracy, therefore, clearly confines the whole article to acts done on tidewater, or abroad, and not within the body of any county; and of which the courts of common law could not otherwise have jurisdiction. The eleventh article speaks of the ports of the Potomac, certainly on tide-water, for there could be none above; and of persons flying from justice. This again, must have been upon the tide-water, and not within the body of any county; because the whole of the river, above tide, not being navigable, or a common highway, was within the bodies of the respective adjacent counties; and could afford no sanctuary to those who should flee from the justice of the municipal law; since they would be there fully within reach of process from the courts of common law of the state to which the river belonged. The twelfth article relates to the transportation of the effects of the citizens of each state across the river free of duty. But it could not be necessary to extend this provision higher than the tide; because a similar stipulation had been previously embodied in the act incorporating The Potomac Company. (d) There is, therefore, nothing in this compact, which relates in any manner whatever to the river Potomac above tidewater. (e)
*127 This compact, of the 28th of March, 1785, is confined exclusively to matters of jurisdiction and navigation; it leaves the territorial rights of the parties untouched. In rivers flowing through conterminous states, a common use is presumed; if there he no proof of a peculiar property excluding the universal or the common use. (f) But, in this instance, there is the most satisfactory evidence of an exclusive right. The boundary, called for in the charter to the lord proprietary of Maryland, is from £the first fountain of the river Potomac, thence verging towards the south unto the further bank of the said river, and following the same on the west and south unto a certain place called Cinquack, situate near the mouth of the said river,’ &c. (g) To the full extent of this call for the right bank of the Potomac, (h) Maryland has always held; and under that holding, all the islands in the river have been granted by patents issuing from the land office or under legislative enactments, or titles derived from this state; (i) and the whole of the bed of the river, above tide, it is believed, has always been admitted to be rightfully parcel of the territory of Maryland. Whether the south, or the north • branch should be considered as the true boundary has long been, and still is, a matter of controversy ; but, before the revolution, many patents for lands, lying between the north, and south branches, were issued by the lord proprietary of Maryland. (j)
Hence I feel perfectly satisfied, that the Potomac, above tide, *128 was originally a private innavigable river; that it is now, in no other manner, and to no greater extent to be deemed a navigable highway than it has been expressly so declared, or than as it forms a part of the route of the navigation formed by the Potomac Company, which alone has been declared to be a highway, common to Maryland and Virginia; that the whole of the river, to its right bank, forms a part of the territory of the state of Maryland; that the whole of it above tide is entirely within the bodies of the respective counties of Maryland lying along it; and, consequently, that its waters above tide may be taken and used by any riparian holder of land, in any manner, without prejudice to others.
The sole object of the act incorporating The Potomac Company was to open a line of boat navigation, from the tide of the Potomac, along the course of the river itself as high up as practicable. All its provisions, with the exception of only two sections, (k) have relation to this object exclusively. And that private property might be in no respect capriciously dealt with, even for that great purpose, it appears, that the company, after they had once made a selection of the location of any canal or cut, forming a portion of the proposed new line of navigation, could not abandon it, and have other lands valued and condemned to them for the same purpose. If the canal, or the locks got out of repair, other land could not be taken, and condemned for making 'another canal, or new locks along side of the old. Because, there was one, and but one distinct provision made for any such condemnation. The power of condemnation given to this company, was not, in its nature, a continuing one, which might have been repeated at their pleasure; nor is there any thing, in their act of incorporation, which contemplates a repetition of it for any purpose whatever; when the authority, thus granted, was once exercised, the law thereby spent itself, and the power of the company, in that respect, was exhausted and gone, (l) and this intention is strongly manifested in that part of the incorporating act, which provides for the calling of a jury to make a further assessment for any damages that should arise, which ‘had not been before considered and valued.’ (m)
*129 This power to condemn private property, is a portion of the eminent domain of the government, granted to this body politic, which should never be exercised by the government itself, but with great caution, and in cases most obviously for the public good. When, as has been justly observed in our country, the legislature undertakes to give away what is not their- own, when they attempt to take the property of one man, which he has fairly acquired, and the general law of the land protects, in order to transfer it to another, even upon a complete indemnification, it will naturally be considered as an extraordinary act of legislation, which ought to be viewed -with jealous eyes, examined with critical exactness, and scrutinized with all the severity of legal exposition. An act of this sort deserves no favour; to construe it liberally would be sinning against the rights of property, (n) In England, it has been said that all courts have, for obvious reasons, at all times, construed such legislative enactments most strictly. Whatever such enactments require to be done, as a condition precedent to the extraordinary right of making roads or canals over private property, has always been exacted to the letter, and the party omitting has been held a trespasser, (o)
From which it follows, that, although the works of the company may be repaired, or any thing may be done to render them more safe, substantial and perfect, yet no additional extent of land can be taken, nor can any canal, or other work be, in any way, altered, remoddled, shifted in its location, or enlarged, so as to be spread out beyond the extent of the first selected purchase or condemnation.
Now, recollecting what it is, that constitutes a natural mill-site on the margin of a descending stream; the peculiar character of this river; and, the general tenor and scope of the act incorporating The Potomac Company, we shall find ourselves properly prepared to undertake the consideration of that section of it, which is in these words :
‘And whereas, some of the places through which it may be necessary to conduct the said canals may be convenient for erecting mills, forges, or other water works, and the persons, possessors of such situation may design to improve the same; and it is the intention of this act not to interfere with private property, but for the purpose of improving and perfecting the said navigation, Be it *130 enacted, that the water, or any part thereof, conveyed through any canal or cut made by the said company, shall not be used for any purpose but navigation, unless the consent of the proprietors of the land, through which the same shall be led be first had; and the said president and directors, or a majority of them, are hereby empowered and directed, if it can be conveniently done to answer both the purposes of navigation and water works-aforesaid, to enter into reasonable agreements with the proprietors of such situation concerning the just proportion of the expenses of making large canals or cuts, capable of carrying such quantities of water as may be sufficient for the purposes of navigation, and also for any such water works as aforesaid.’ (p)
The great object of this law was the formation of a new line of navigation; but here a new subject is introduced; mills are provided for in connexion with certain canal portions of that line. ‘ Some of the places, it is said, -through which it may be necessary to conduct canals, may be convenient for erecting mills.’ Any place on the margin of this stream, at all convenient for erecting a mill, must have the qualities which has been described; for; although it may be said, that this expression may refer to the middle of the river, or any place through which a canal may be conducted, of which there may be a great number and variety along the line of this new navigation; yet, in this case, we are not allowed to take any such range; because, the claims of this plaintiff are expressly confined to that space of land on the left bank of the river, extending from the head of the little falls to tide. .Therefore, this expression, so far as regards the claim of the plaintiff, cannot possibly refer to any other kind of mill-sites, than- such as have been described and designated by the diagram ABC. The places spoken of are such only as have the natural qualities of mill-sites; they are not such as the new work may make convenient for erecting mills, but such only as were so naturally at that time.
Again, it is said, that ‘ the persons possessors of such situation may design to improve the same.’ Whence it appears, that the subjects spoken of are naked natural mill-sites; not any situation on which a mill has been erected; but merely those which the owner ‘ may design to improve ;’ and it must have the qualities which have been shewn to belong to such a natural mill-site ; for, otherwise it cannot be regarded as a place ‘ convenient for erecting *131 a mill/ or as such a situation which the owner ‘ may design to improve.’ The sort of place spoken of is, thus, clearly specified and ascertained; and the owner is described, as ‘ the person possessor of such a situation / that is, as a person who is the possessor of a mill-site. But a natural mill-site may exist, and yet no one, or any two or more individuals may be the legal owners of it; because, a natural mill-site being incapable of division, if any portion of the land necessary for the head and tail race, and the. position of the mill be separated from the rest, by being held in severalty by different owners, there exists, in fact, no legal right in any one to such natural mill-site. And certainly the legislature could never be understood to say of any one, ‘ that he may design to. improve,’ any property to which he has no legal right, in any way it might be improved, if other parcels were united with it, and the whole were held altogether by one and the same.owner.
This plaintiff founds his claim, under this section, upon the fact of his being one of the ‘ persons possessors of such a situation.’ But, it appears, that this large tract of land binding on the river Potomac, from the little falls to tide, was originally granted by the state in distinct parcels to different persons ; that it has undergone since several divisions, and re-unions; and that it does not appear, from any thing in- the case, to what separate parcel this plaintiff is entitled; nor does it appear, whether the parcel he owns is sufficient to constitute a mill-site; and was so held by him, or those under whom he claims, at the time this act was passed, without any division, or alienation of any of its necessary constituent parts, since that time; nor is there any thing in the case which shews who were the possessors of mill-sites in the year 1784, or when this suit was instituted, or at any other time.
£It is the intention of this act, not to interfere with private property, but for the purpose of improving and perfecting the said navigation.’ The kinds of ‘private property/ here referred to, were the unimproved mill-sites, which had been previously designated. This act, by means of the work, which it gave authority to construct, could interfere with a mill-site in only one of two ways; either by preventing the water from reaching it, or by occupying the whole, or a material portion of the very mill-site itself. These two modes of interference could be effected by only one kind of work; that is, by a canal; because, this sentence must be taken in connection with its context; and then it must be read thus, at places through which it may be necessary to conduct ca *132 nals, they, the canals, may interfere with mill-sites, with which it is the intention of this act not to interfere, but for the purpose of navigation, unless with the consent of the proprietors. Consequently, if the new navigable canal interfered with a mill-site, either by diverting the water from it, or by occupying its place, there were but two modes of redress left to its owner. Either to accept an equivalent in money to be agreed upon by the parties, or to be settled by a jury; or to have the canal itself appropriated as a head-race to it; and thus save it to himself, and for the benefit of the public. To give the possessors of mill-sites this latter choice, subject to certain restrictions, was the sole object of this section, and none other. And accordingly, with this intention the legislature proceeds to enact:
‘That the water, or any part thereof, conveyed through any canal or cut made by the said company, shall not be used for any purpose but navigation, unless the consent of the proprietors of the land through which the same shall be led be first had.’ The general tenor of the act had confined all the operations of the company to the formation of a new line of navigation; and here, that restriction, in accordance with the whole spirit of the act, is distinctly expressed and repeated, as is evident, with no other view than to ingraft upon it an exception. The water of the river, it is declared, ‘shall not be used for any purpose but navigation;’ this is the general rule, then comes the exception, ‘unless the consent of the proprietors of the land through which the same shall be led be first had.’ This is the exception and condition upon which the water of the river may be used for mills as well as , for navigation. ‘The consent of the proprietors must be first had.’ If it can be had, then it appears, that the corporation, as well as the proprietors, may use the water for mills; or they may jointly participate in making that use of it. But, if the proprietors maliciously or capriciously withhold their consent, the corporation must submit; for, no power is given to it, in such case, to have the property valued and condemned to any such use. The will or consent of the proprietors is not, in this respect, subject to the slightest control, they are left perfectly free to consent or not at pleasure.
‘And the said president and directors, or a majority of them, are hereby empowered and directed, if it can be conveniently done, to answer both the purposes of navigation and water-works aforesaid, to enter into reasonable agreements with the proprietors of such situation concerning the just proportion of the expenses of *133 makiiig large canals or cuts, capable of carrying sucb quantities of water as may be sufficient for the purposes of navigation and also for sucb water-works as aforesaid.’ The first condition upon which an application of Water may be made to mills, as well as to navigation, is the consent of the proprietors. But, supposing that to be given, still, there are other conditions of the most grave importance, which must all be complied with, before any water can be taken from these canals for mills. The company are empowered and directed to do so, ‘if it can be conveniently done to answer both purposes.’ This allows to them an extent of discretion, which cannot be duly appreciated without adverting to the consequences of making a navigable canal tributary to mills as their head race.
The application of Water as the propelling power of mills, requires that it should flow in currents, no matter how rapid, so it does not inundate the position of the mill; but the perfection of a navigable canal is, that the water it contains should be entirely motionless. The one use requires quick motion, and the other stillness. Hence the unlimited application of the same volume of water; or rather the having of water conducted along a cavity to answer both purposes is absolutely and directly incompatible. (q)
To illustrate this, we must again recur to the diagram. Let A D be the navigable canal twenty-five feet wide, and two feet deep, made tributary to mill-sites as a head race. Suppose the whole line from 4 to D, affords sites for mills; and that, within that space, there is room for the erection of forty mills ; then suppose that the dimensions of the canal constructed, be ‘capable of carrying such quantities of water as may be sufficient’ for twenty mills only. It follows, that one-half of the mill-sites cannot be occupied; and that the other half must totally annihilate the navigation. But, if the draft from the canal for mills be of such a volume as to give a rapid motion to the waters, the navigation, in one way at least, *134 must be greatly hindered and retarded; and so far the two uses of the water are also incompatible. It is to that incompatibility of those two uses, when exercised without limit, to which this law here alludes; and it is that matter which it was the intention of the legislature to submit to the sound discretion of the corporation. (r)
Hence, I feel satisfied, that by this expression, 1 if it can be conveniently done to answer both purposes,’ this body politic has been clothed with as perfect a freedom of will and discretion, as that reserved to the proprietors; because, even if the corporation should refuse to ‘ enter into a reasonable agreement,’ the proprietor would not be without redress; since the law has provided for him an adequate mode of obtaining compensation for bis property; and because, if the corporation were held to be under any sort of obligation, such obligation would place it in the power of the proprietors to subject the body politic to such a judicial control as might defeat the principal and great object itself. It being then a. matter entirely at the pleasure of the corporation to enter into such reasonable agreements as they might think proper; and no contract appearing to have been made with this plaintiff, or any one under whom he claims, the court finds this company under no kind of legal obligation which it can command them to fulfil.
In the preamble to this section, it is declared, that ‘ some of the places, through which it may be necessary to conduct the said canals, may be convenient for erecting mills.’ And here, it is said, that reasonable agreements may be made {with the proprietors of such situation concerning the just proportion of the expenses of making large canals or cuts.’ The whole law, from beginning to end, speaks of but one line of navigation; it affords all the powers necessary to make that one line, but no more. Canals and cuts are parts of the line; and they are directed to be twenty-five feet wide, and four'feet deep; (s) which were deemed sufficient for all the purposes of the contemplated navigation. It was not deemed necessary to give to the corporation authority to make larger canals for that purpose; or to alter the route of a canal; or to enlarge it after it had been made.
*135 The ‘making large canals,’ therefore, can only mean such as were to be made originally, and in the first instance. If the proprietors and the company could agree ‘ concerning the just proportion of the expenses,’ those canals, when about to be laid out, were to be made to suit both objects, instead of that one only, the necessary dimensions for which are specified; that is, if upon agreement any increase in the specified dimensions of the canal to answer the additional purpose should be determined upon, an estimate of the expense -was to be made; and ‘ the just proportion of the expenses of making large canals or cuts capable of carrying such quantities of water as may be sufficient for the purposes of navigation, and also for any such water works,’ as the proprietors of the mill-sites might desire to erect, should be then finally ascertained. The two purposes were to be answered at once, and in the beginning by their ‘making large canals.’ How large over and above that which was declared to be sufficient for navigation alone, is no otherwise specified, than by declaring, that it should be ‘ capable of carrying such quantities of water as maybe sufficient for both purposes.’
Hence, it is perfectly manifest, that the legislature had meditated upon the incompatibility of answering the two purposes, of navigation and mills, to an unlimited extent from the same canals; and had guarded against it by thus unequivocally declaring, that the canal should be commensurate to both purposes. The legislature did not leave it in the power of any proprietor of land, by withholding his consent, or refusing to enter into a reasonable agreement, to prevent the corporation from making a canal of the specified dimensions for navigable purposes; for, to meet any such opposition, it is provided, that a jury may be called and his land condemned; because the new line of navigation being a highway, and dedicated to public uses, such condemnation might rightfully be made, by virtue of' that eminent domain, which has been tacitly conceded to the government over all private property.
But although a great and eminent balance of good to the public has authorised the violation of private property under every mode of government in the world; (t) yet, in such cases, even the greatest of despots has been irresistibly struck with the justice of the demand for an adequate compensation, (u) But the construction of mills, the enhancement of the value of private property, and the aggrandisement of individuals alone, without any view to the pub- *136 lie good, are certainly not such causes as can alone justify the exercise of the government’s power of eminent domain over the property of any one. (v) And therefore it wás, that no power was given by this law to have any private property condemned for .the use of any-mill, or to subserve the purpose of any water-works, which any individual, for his own private emolument, might be willing to associate with the canal to be constructed by The Potomac Company. The additions, to the specified canal, for all such purposes, were to be obtained by reasonable agreements; and in no other manner whatever; if they could be conveniently made in that way to answer both purposes, this section- allowed it to be done; if not, no condemnation was to.be suffered at any time, for any such purpose. ‘ ' •
But supposing the right to condemn granted to this corporation,it must have been intended to provide for the erection of mills in connexion with the canal. Then it is evident, that both purposes must be comprehended in -the original formation of those canals ; and the acquisitions of the company for that purpose. The law no where, by any express words, or by any fair construction, authorises the company to make any new and additional, acquisitions along the line of navigation formed by them, even for the purpose of that navigation; much less for mills, or any other, or additional purpose. But the erection of mills, to which the canal is made tributary, as a head, race, necessarily requires the ‘making large canals, capable of carrying such quantities of water as may be sufficient for both purposes;’ and, consequently, if they have not originally that capacity, .they must be enlarged before mills can be supplied from them.
This canal, it is admitted on all hands, has no more than the specified dimensions of the required navigable canal; and,, therefore, if the plaintiff’s claim is to be gratified to any extent whatever the canal must be enlarged;' and its capacity for carrying an adequate additional quantity of'water provided for in some way. This, I apprehend, can only be effected by additions, in one of three modes; by adding to its width, to its depth, or to its height. We have only to cast an eye over the plots filed in this case, to see, that if it is to' be widened, the corporation must, for that purpose, acquire an additional breadth of land on one or on each side. *137 If it is to be raised then, on reverting to the diagram, it will be seen, that supposing the canal A B, to be the head race, it can only be effected by a dam A 2, or an elongation of the canal to 1, and in either case, the absolute right in the land itself, or the right to flood the land A 2 1, must be acquired by the corporation. Again, if it is to be deepened, then the excavation at A, must be such as to draw off the water from the land A 2 1, to its prejudice; and consequently, a right to do so, or a clear title to the land must be acquired by the company. Every possible way then, of enlarging the canal, after it has been once formed, necessarily implies a new acquisition of property by the company. But the act of their incorporation, has given them no power whatever to purchase and hold, much less any authority to take from others, and have condemned to their use any property, or franchise whatever to be applied to any such purpose, (w)
That this is the correct construction of this law is strongly sustained by the express provisions of an act passed at the then next preceding session of the General Assembly, upon a subject, in all respects, precisely similar; which act after constituting certain persons a body politic, by the name of The Proprietors of the Susquehanna Canal, for the purpose of constructing a canal as described, declares, that cit is necessary for the making the said canal, and erecting grist-mills and other water-works thereon, that provision should be made for condemning a quantity of land not exceeding two hundred acres.’ And it then proceeds to enact accordingly, (x) But in this act incorporating The Potomac Company, no such provision has been made in any form. And it is also worthy of remark, that the eleventh section of the act incorporating, The Pocomoke Company, (y) appears to have been copied verbatim from the thirteenth section of the act incorporating The Potomac Company, neither of which contains any provision for erecting water-works similar to that of the act incorporating The Proprietors of the Susquehanna Canal.
Much has been said about the surplus water and the waste water of the canals of The Potomac Company, as evidence of its being the intention of this law, that the adjacent and riparian owners of land should be allowed to draw such a quantity of water from it as might be necessary for any mill they might wish to erect; and of *138 the right to such waters, which the owners of the land, over which they have been suffered to flow, have acquired by a kind of prescription. It must be recollected, however, that the phrases ‘surplus water,’ and ‘waste water,’ are nowhere to be found in the act incorporating The Potomac Company; and that, in using those expressions, facts are referred to, which are not mentioned at all in that law.
It appears, among the circumstances of this case, that the canal which this plaintiff has claimed the right so seriously to incumber, if not to destroy as a navigable passage, by drawing off its waters to mills, has not been in any manner protected at its upper entrance from the wild ungovernable river, with which it is connected; the freshets of which rise from fifteen to thirty feet above its low summer level. In consequence of which, the canal, like its fountain, the river, has its seasons of bursting fulness and of comparatively low small volume. Left so exposed to the violences of the river, it is by no means extraordinary, that there should be in the canal a multitude of leaks, cracks, and rents from which great sluices of water are continually gushing out. These escapes from the canal may well enough be called ‘waste water;’ and they afford very satisfactory evidence of the improper exposure and imperfect structure of the canal; but it seems to be a mistake to summon them up as proofs of there being a regular amount of ‘surplus water’ in it, sufficient for mills. They are facts, which prove, that the canal has been very rudely and injuriously intruded upon by the river, for want of guard-locks at its upper entrance, and nothing more. Indeed so far from affording any evidence, that the canal has a capacity to carry water sufficient for mills, as well as navigation, they are proofs, that, for want of a guard-lock at its inlet, it is alike unsafe and dangerous to both, since the swollen torrent, which obstructs navigation, might sweep a mill to destruction, by the same kind of force which rends and prostrates the banks and mounds of the canal itself.
But it seems to be a still greater mistake as to the nature and causes of these issues and sluices, to cite their long continuance as furnishing a presumption, that the owners of the land, over which they flow, have a right to consider them as permanent streams on which they may erect mills. Presumptions of fact are conclusions drawn from particular circumstances. They are such inferences as áre found by experience to be usually consequent upon or coincident with certain known facts. A presumption of right always *139 supposes some tacit, or implied admission of him against whom it is brought to bear, that the title claimed is well founded. The principles of common law presumptions arising from lapse of time, and those statutory limitations which have been introduced to quiet the rights of individuals, are among the most balmy principles of the law, and should always be highly respected, (a) Before a presumption of right can, however, be founded upon the continuance of certain circumstances during any length of time, it must be shewn, that such circumstances necessarily involve an admission of the right of him by whom it is claimed. There must appear to be such an obvious connexion between the circumstances, and the right, that so soon as the circumstances are established an irresistible inference immediately arises that the right as claimed must also exist. (b)
But the fact of there being rents in a canal affords a just foundation for presuming, that it has been badly constructed; or that it is exposed to such floodings as to diminish its utility and make it very expensive to its owners. It by no means follows as a fair consequence from such facts, or from their long continuance, that the owners of the canal had made such sluices, or suffered them to continue with an implied or tacit understanding, that they might be considered as constant streams applicable to mills. There is no obvious or natural connexion between such circumstances and the existence of such a right in any form; nor has such a right been found by experience to be usually consequent upon, or coincident with any such known facts. The continuance of such circumstances does not, in any manner, involve an admission of any such right; nor do they stand in the slightest degree related as cause and effect. If the canal had been protected, as it ought to have been, by a guard lock at its inlet, its supply of water would have been regular; it might have been made perfectly close every where, and there would have been no waste or apparently surplus water gushing from its sides. These presumptions urged by the plaintiff are, therefore, wholly unfounded. From all which it is perfectly clear, that this act incorporating The Potomac Company, has neither given nor reserved to this plaintiff, or to any proprietor of land, any shadow of right, independently of any express agree *140 ment, of which there is no allegation or proof of any having been made, to make any portion of the navigable canal, constructed by that company, tributary to any mills or water-works, or to draw water from such canals for any purpose whatever. .
This plaintiff, after having presented himself as the legal owner of certain natural' mill-sites; and as the claimant .of certain privileges with which the property of these defendants stand charged; and endeavouring-to sustain his right to have that property, ,and those privileges protected by the conservative process of this court, now assumes a new and entirely different garb, and comes before the court as one of the society, and a collegiate brother of the defendants. He alleges, that he is a stockholder of the body politic, called The Chesapeake and, Ohio Canal Company; that, the corporation themselves, or their president and directors are expending the funds of .the institution in a manner not warranted by law; and are erecting works, and extending them to points beyond the assigned limits, to answer purposes,' and subserve interests entirely alien to the great objects, of the act of incorporation, and altogether at variance with the authority conferred by. it, which operations, the plaintiff complains-, will work a fraud upon him, and result in the most irreparable injury to his property and rights as a stockholder in the company.. And he thereupon prays, that these defendants may be restrained by an injunction from thus illegally misapplying those.funds.
The defendants meet and oppose this complaint; first, on the ground, that the works, projected and now in part executed, were expressly authorized by the whole corporation, at a general meeting, to which all the stockholders were regularly called, and this ' plaintiff among the rest; which determination of the corporation, in general meeting, must be deemed final and conclusive; next, on the ground, that the erecting and extending the works, in the manner projected, being altogether within the District of Columbia, is a matter which belongs exclusively to the government of that District; and, having been heretofore submitted to a legal and competent tribunal there, by which the formation of them had been decided to be legal and proper, this court can have no jurisdiction of the matter in any way whatever; and' lastly, upon the ground, that the erection and extension of the works as planned, and in part executed, are in violation of no law, and have been authorized by the express provisions of their act of incorporation.
The validity of the first of these grounds of defence must de *141 pend upon the extent to which the resolutions of this corporation are to be deemed final and conclusive; or, how far this court can exercise over bodies politic of this, or any other description, a superintending and controlling authority. It must be constantly borne in mind, that all corporations are artificial beings who have all the capacities and faculties of natural beings to the full extent of the powers vested in them by the express terms of their incorporation ; and also of such other powers as are necessarily incident to those expressly granted. Each corporation, whether sole or aggregate, or however constituted, is and must be, from its nature, an artificial being, in itself altogether separate and distinct from that of any one, or any aggregation of natural persons of whom it is constituted. The internal government of many of the corporations of England is exercised subject to the superintendence and control of the visitor, who is, most commonly, the private founder or donor of the funds with which it deals. This visitatorial power, in the hands of private persons, is exercised in á summary or arbitrary manner, and being liable to abuse, is therefore never encouraged or extended, (c) But where there is no special visitor, which is commonly the case with all civil corporations, the visitatorial power is exercised, in England, by the Court of King’s Bench, by means of a mandamus, or information; (d) and here, in like manner, by the courts of common law having original jurisdiction.
In this instance, the object is to control this company in the disbursement of its corporate funds, on the ground, that they are not applied to corporate purposes, or in the manner authorized by the act of incorporation. It is said, that according to the civil law, the rights of bodies politic over then corporate property is like that of minors; and that they cannot be permitted to dispose of it in any way to the prejudice of the institution, (e) But, according to the common law, it is otherwise; for it is laid down as an incident of all bodies politic, that corporate property may be encumbered, applied, or aliened, by its full and regular- assent, in any manner, and for any purpose whatever; the will of the artificial body, as of a natural body, in all such cases, being the law, and standing in the place of any reason for so doing. This uncontrolable right of alienation, in the case of ecclesiastical corporations, in England, *142 was productive of such evils, as occasioned a check to be put upon it by what are, there, called the disabling statutes; but, as to all other corporations, the common law rule is still in force, (f) There are many cases to be met with, and some of a very complicated nature, where a single corporator has by bill in equity called the corporation itself to account, in order to obtain his due share of rents and profits; (g) and also where the body politic itself has, by bill, asked to have relief against its own directors, officers and servants, in respect of their frauds, mismanagement, or breaches of trust. (h) But this is the first instance, in this court, in which a member has charged the body politic itself with making expenditures not for corporate purposes; and, on that ground, prayed to have it prevented from doing so by injunction.
It is said, that, in this case, such a restriction may be imposed; because, the state is a stockholder; and, therefore, that the public is peculiarly interested in the proper application of the corporate funds. But if the republic condescends to become a dealer in stocks, and to place herself upon the foot merely of a corporator, or member of an incorporated company, she must, by so doing, be presumed to have consented to have her funds so invested, subjected to the same management, and made liable in the same manner, and to the same extent as those of the individual corporators with whom she has become so associated, (i)
It seems to follow as a just, and necessary consequence, from the very nature of delegated and limited powers, with which kind of authority alone this corporation has been invested, that there ought to be, and must exist somewhere a superintending authority to restrain and confine the exercise of such powers within the limits assigned to them. Within the scope of its general and discretionary powers, the authority of the corporation to dispose of its funds, for any purpose whatever, may be admitted to be absolute and beyond all control. But, if property be given to a body politic for certain specified and limited purposes, any application of it to an obviously different object is a violation of the law; and consequently, expenditures not for corporate purposes, in whatever *143 way they may have been authorized by the body politic, may be enjoined and prohibited, (j)
It is therefore conceived, that this resolution of The Chesapeake and Ohio Canal Company, by which these projected and in part executed works were directed to be made, is not such a final judgment of this body politic itself, as precludes this court from taking cognizance of the matter, and determining, whether the application of the funds, to defray the expense of such works is an expenditure for corporate purposes within the true meaning of the act of incorporation or not.
The next ground of defence is, that the extended works complained of, are altogether within the District of Columbia; the government of which, as regards this matter, being independent of, and alien to this republic, this court, therefore, can have no jurisdiction of the matter. It is said, indeed, that a judgment has in fact been pronounced by a legal and competent tribunal of the District of Columbia; but, that is of no importance, according to the broad ground taken by the defendants; for, if this court has no jurisdiction; because the matter belongs exclusively to the judicial authority of the government of the District of Columbia, then it follows, that this court is alike precluded, whether the tribunals of that government have already, or may hereafter adjudicate upon the subject.
So far, The Chesapeake and Ohio Canal Company has been considered as a body politic, deriving its corporate capacity altogether, and exclusively from the State of Maryland; as one of the artificial legal entities of this republic; and as standing fully-and in every respect within Hie jurisdiction of this court. But here, an exemption from the jurisdiction of this state is claimed, on the ground, that it owes its existence to other governments as well as to this; and that its works do, in fact, compose a part of the territory belonging to those other governments, over which territory this court can exercise no authority whatever. It is believed, that this matter has never before been submitted to tire consideration of any of the courts of this country; and yet it presents important ques *144 tions, as to jurisdiction, which may, in the progress of things, frequently arise, since there have been many bodies politic created, like this, by the concurrent acts of several state governments with property lying, or extending beyond the jurisdiction of each one of its creators. In Maryland there have been several canal, bridge, and turnpike-road companies constituted in this manner. (k)
The legislative enactment of Maryland, by which The Chesapeake and Ohio Canal Company has been incorporated, distinctly authorizes, so far as it can give any such authority, the extension of its works beyond the confines of this state; and over territory belonging to other, and, in this respect, independent and unconnected governments. Each of which has communicated to it the same powers. The Chesapeake and, Ohio Canal Company must, therefore, be regarded as a corporation, one and indivisible in its nature; yet as a body politic which stretches itself, in an unbroken line, under the separate jurisdictions of several governments; holdr ing and occupying portions of the territory of each; and as an artificial being formed by an infusion of the spirit and power of all. According to this constitution of its existence, it has received its funds, makes all its expenditures, and must hold its estate. To ascertain whether, in point of fact, any of the disbursements of this body were for corporate purposes or not, it would seem to be proper to dismiss from the inquiry every consideration as to the different sources from which it deduced its existence; and simply to determine, whether the authority to make the expenditure was given by the act of incorporation or not; taking it to be a law of one single government only.
The question here presented, however, is not whether the expenditure is for corporate purposes or not; but one preliminary to that, which is, whether the determination of that question belongs exclusively, or to what extent, to the judicial authority of any one of the governments by which this single corporation has been erected ?
No court of justice can act upon any controverted matter where both the person and the thing are beyond its reach; and every tribunal, not acting under the law of nations, has some local limits to its jurisdiction; indeed those which have been charged with the administration of justice, under our common law code, have a very special and peculiar reference and adaptation to the territorial divisions of the state. (l) But the jurisdiction of the High Court *145 of Chancery over the matters of which it takes cognizance is coextensive with the confines of the state itself. According to its original constitution, it could act upon the person only; but its powers have been, in many respects, so enlarged as to enable it to act also upon the subject in controversy; and it has been specially authorized to. use the executive and coercive process of the common law. (m) Thus braced and armed it possesses powers and means to afford redress in almost every case, not exclusively belonging to the courts of common law, or in which they are so constituted as to be able to give adequate relief. Wherever a person is to be found within reach of the Court of Chancery, and he may, in any respect, be considered as a trustee, or the matter in dispute arises out of a transitory personal contract, not necessarily involving the title to, and following land; and which the party may, by personal coercion, be made to execute specifically, this court may have jurisdiction and decree accordingly. Therefore, if a defendant be found here he may be decreed to pay money, or to account for the rents and profits of lands lying in another,' or a foreign country, which he had held and enjoyed; or if a deed of lands in a foreign country be found to be fraudulent, it may be ordered to be delivered up and cancelled; or in specific performance of a contract for land in another state, such a conveyance may be ordered as shall be sufficient according to the law of the state where it lies. But the court will not decree a partition of such land, or in any manner directly decide upon the title to it, or upon the validity of a deed or will as a material part of the title; ^ior found the relief granted upon the strict title to such property itself, (n)
The whole estate of The Chesapeake and Ohio Canal Company, at least so far as it consists of the canal itself, and its necessary buildings, and the fixtures attached to them, must, according to the common law, be regarded as reality; (o) and it was so consi *146 dered by tbe original act of incorporation; but by a subsequent enactment, it has been declared, that it should be deemed personal property, (p) The right to land is, and necessarily must, be regulated by the law of the government under which it is situated. Mere moveables are generally allowed, by the comity of nations, to be disposed of according to the law of the place of the owner’s domicile, (q) The reason why land must be governed by the law of the country where it lies, does not arise, in any manner, from our common law distinction between real and personal property; but, from the principles of international law, which regards land as a portion of the habitation of the nation; and which, from its fixed and immovable nature as such, must, of necessity, be absolutely and altogether regulated by the nation to whom it belongs. And therefore, a conveyance or will of land, a mortgage or a contract concerning such as canal stock must all be sued upon in Maryland, and tbe local nature of the thing requires them to be carried into execution here, (r) It would seem, however, that in a work of the kind now under consideration, if tolls are appointed to be gathered at a place within the jurisdiction of either of the governments, for the use of a space of canal, a part of which extends beyond its limits, such toll might be considered as forming a portion of the product of the canal property within the jurisdiction of the government where they were gathered, (s)
Hence, it appears, that directing the estate of this corporation to be deemed personal property, can amount to no more than declaring, that it shall be governed by the municipal regulations of the country where it lies in relation to personal property, instead^ of those relative to real estate; but that it must, nevertheless, be governed by those laws, and none other, as being an immovable portion of the habitation of the nation. These principles of public law, in regard to the immovable property of this corporation lying beyond the confines of this state, bring us back to the question, whether this court can exercise any jurisdiction in relation to such property, and to what extent.
*147 Although the power of our government constitutionally to create a corporation beyond its jurisdiction, or to confer the rights and privileges of a body politic upon any but its own immediate citizens, so as thus to give an extra territorial operation to its legislative enactments, may well be doubted; yet the establishment of a body politic, clothed with authority to conduct expensive and profitable operations beyond the limits of the state by which it was created; and under governments by which its corporate existence has not been recognized, it is believed, is a matter of no very extraordinary or rare occurrence. The East India Company, and The South Sea Company of England, (t) and The Temascaltepec Mining Company of Baltimore, The Tlalcotal Mining Company of Baltimore, and some others here, are corporations having such powers, (u) If an individual has a well founded claim, arising from, or is likely to suffer by the foreign operations of such a corporation, and the case be of an equitable character, this court may take cognizance of it, and grant relief, if the body politic or its property are to be found within reach of its process, (v) And so too a corporation which has been created by a foreign government, is a legal entity of which the courts of this republic will take notice, and allow to sue, and maintain its rights here; and have funds here applied to its use out of the limits of the state, (w)
But a corporation cannot, on the ground of its foreign origin, or on the ground of its being an artificial creature of a different state from that of which the opposite party is a citizen, be allowed to sue or be sued in the federal courts; because the jurisdiction given to those courts, founded on the character of the litigants, is put upon the foot of their being natural persons, integral members of society, who are citizens of different states. Corporations, therefore, cannot be qualified to sue in those courts upon that ground, otherwise than by -looking, according to a most latitudinous construction of the federal constitution, to the natural character and citizenship of all the individuals of which the artificial body is composed, (x)
*148 Nor is there any provision in the Constitution of the Union which confers jurisdiction upon the federal courts in any case where a body politic is a party; because of its having been concurrently incorporated by two or more states. The Chesapeake and Ohio Canal Company has been incorporated by the governments of the District of Columbia, and those of the states of Virginia, Pennsylvania, and Maryland; and now holds, or may hold, much immovable property, which must be subject to the exclusive jurisdiction of each of them.
It necessarily follows, that this body politic, must, for the purposes of justice, be treated as a separate corporation by the courts of justice of each government, from which it has derived its being; that is, as a domestic legal entity to the extent of the government, under which the court acts, and as a foreign corporation so far as. regards the other sources of its existence; that although the direct and strict merits of its title to the immovable property it holds, under the other governments of its origin, cannot be determined in any of the courts of this republic; yet, that the body politic itself may, because of its being found here, be restrained from wasting its funds, or expending them for any other than corporate purposes any where, in violation of the delegated authority with which it has been clothed; that, so far as regards the title to its immovable property, where it becomes necessary to restrain the making of any excavation, or erection upon it, or to obtain redress for any injury done to it, the courts of justice under whose jurisdiction it lies must have exclusive cognizance of the matter; and that, in all other cases, they must have concurrent jurisdiction, (y)
The dam, the erection of which is complained of, is to be extended entirely across the river Potomac; and therefore, one part of it must rest upon the territory of Maryland and the other upon that of Virginia; consequently, to that extent each state must have an exclusive jurisdiction, so far as it may be necessary to prevent its erection by injunction. But the object of preventing the erection of this dam is to put a stop to the expenditure of the funds of the body politic, for other than corporate purposes, within the District of Columbia; and consequently, so far only as the body politic *149 may be restrained, by injunction, from making such illegal expenditures any where, the courts of justice of each government must be allowed to have equal and concurrent jurisdiction. Under the articles of union between England and Scotland, it is admitted, that there may be cases in which it would be difficult or impossible to do justice, unless the courts of the several states gave aid to each other; and so co-operated within their respective jurisdictions, from which all other judicial power is excluded, as to render the judgments of the tribunals of each state effectual within their proper spheres, (a) So in this country, under the limited nature of our federal union, it is perfectly obvious, that, in cases of this kind, without a proper degree of comity and mutual aid, evils may arise from the conflicting adjudications of the separate, co-ordinate and independent courts, which must be allowed to take cognizance of such matters; because of there being no common tribunal, in the last resort, by which their different determinations may be harmonized. Yet, such an exercise of jurisdiction, with all its probable evils, must of necessity be allowed, since there would, otherwise, be a total failure of justice. (b) For these reasons, the defendant’s objection to the jurisdiction of this court, as relates to its power to inquire into the propriety of expenditures within the District of Columbia, may be entirely put aside.
Supposing that they might fail of making good their two first grounds of defence, these defendants have presented a third, upon which they mainly rely. They insist, that they are fully authorized to extend their works, as projected, within the District of Columbia ; that, this dam, being necessary and proper for that legitimate purpose, may well be erected under that authority; and that they ought not to be judicially prevented from erecting it accordingly.
The parties, in relation to this point, ranging far a field in verbal criticism, and taking it for granted, that the act of incorporation was so excessively ambiguous, as to require all manner of assistance to reach its meaning, have carefully gathered up almost all the sayings and doings of the originators, advocates, and meddlers in what they have called, ‘ the great enterprise,’ and adduced them to shew what is, what was intended to be, and what this court should pronounce to be the true intent, and meaning of this act of incorpo *150 ration, as to the terminations of the great line of canal navigation, which it was the design of this law to cause to be constructed. The court cannot think, that this act of incorporation is so very obscure as it has been said to be, in relation to the terminations of the projected canal. But, allowing it to be so, to a considerable degree, it will be fit and proper, after so much argument has been bestowed upon the subject, to say something as to the extent and nature of the external help, that may be called in upon this occasion.
No verbal proof can be admitted to explain a written contract, much less should it be allowed to introduce such testimony to shew what was the true meaning of an act of the legislature. If the language used be absolutely contradictory and absurd, the law cannot be carried into execution, and the design of the legislature, however well known it may be from inference or other circumstances, not having been expressed, must altogether fail, (c) A latent ambiguity is one which is not apparent upon the instrument itself; but becomes so by applying it to the subject to which it relates as, if it disposes of a tract of land by name, and the maker of the instrument has two tracts of the same name; in such case proof is allowed to shew which of the two was meant. But this act of incorporation is not charged with being ambiguous in this sense; nor is it alleged, that its otherwise clear phraseology has been in any manner thrown into doubt and confusion by any exhibition of the facts, circumstances, and things to which it relates; on the contrary, those great objects, the rivers, and the mountains of which it speaks, now as when it was passed, had their existence in nature on the surface of the country, unchanged and unchangeable ; and therefore', a latent ambiguity, in any legal sense of that expression, cannot be shewn to exist by any proof whatever.
The act provides for the making of a ‘ navigable canal from the tide-water of the river Potomac.’ And the question arising but of this expression is, as to where the canal shall begin. Hence it is obvious, that the proof of facts and circumstances of any kind, as evidence of what was really intended to be the point of beginning thus described, can only be allowed on the ground, that it is admissible thus to assist in the interpretation of expressions which are doubtful upon their face, and so to aid the court in making out the sense of the legislature by other means than the language used. *151 "when taken in connexion with the known and established nature of the subject of which that language treats.
Private acts of assembly are, in a great variety of cases, and in many respects, regarded as mere contracts, binding alone on those who apply for and are parties to them. As to such acts, and ancient charters, there are some kinds of doubts and obscurities which may be removed and dispelled by extrinsic evidence. Where however the terms of such an enactment are not in themselves doubtful, no such evidence can he introduced, since that would be not to obviate but to create doubts, (d) In regard to such private acts the petition of the applicant, and the votes and proceedings of the two houses of the General Assembly may, perhaps, be received as evidence affecting tire rights of the parties, and guiding the construction of such private legislative enactments, (e) But in all *152 other cases where the language of a legislative enactment is clear, explicit, and unambiguous, a court of justice cannot depart from its sense as expressed; and if its directions cannot be executed in the manner prescribed, whether the defect proceed from a mistake, or the negligent inattention of the legislature, no court of justice can supply the deficiency, (f) It has beed said, that, in England, the judges have often demanded what the law was, and how a statute should be expounded, of the lords in parliament, (g) It is evident, however, that in those cases the court has had its doubts removed and the ambiguity cleared away, not by any extrinsic evidence; but by the legislators themselves, responding either as a legislative body, or as the supreme court in the last resort. In the celebrated case concerning literary property, a question arose as to what was the common law before the passage of the statute for securing a copy-right to authors; (h) and in casting about in every direction to ascertain 'that, it was argued, by several of the judges, that the statute itself, as well as the proceedings of the parliament by which it was enacted, afforded proof of what was generally understood, at that time, to be the common law upon the subject, (i)
But every species of evidence may be introduced to show what the common law is now, or has been at any time past; because that part of our. code is made up of reasonable principles and established usages, the existence of which, in the absence of express adjudications and records, can only be shewn in that way. (j) And, therefore, for that purpose, the judges had recourse to the history of that act, they adverted to the petition on which it was introduced into the house of commons, as found on the journals of *153 that house; to the debates upon it and to the amendments it had undergone; and to the language of the act itself, as evidence of what was the then existing common law. But it is not said, nor can it be inferred from their arguments, that the judges deemed it allowable to introduce all such matter as evidence, by which the true sense of that act itself was to be ascertained, in relation to any case for which it had provided; on the contrary, one of the judges, speaking to this point, aftér noticing, that it had been strongly contended by one of the counsel, that from the amendments in the committee of the house of commons, and from the change of the title, that the Parliament meant to take away, or to declare there was no property at the common law, says, ‘that the sense and meaning of an act of Parliament must be collected from what it says when passed into a law, and not from the histoiy of changes it underwent in the house where it took its rise. That histoiy is not known to the other house, or to the sovereign.’ (k) From which it clearly appears to have been his understanding, that it was improper,to admit even the proceedings of either one of the branches of the legislature itself, as evidence of the true construction of a statute. And upon a more recent occasion, when the construction of a statute was drawn in question, the court looked into the proceedings of parliament in relation to the act, but declaring that it laid no stress upon them, grounded its decision upon previously adjudged cases-. (l)
The act, under which The Chesapeake and Ohio Canal Company has become a body politic, originated with the legislature of Virginia, has been adopted and re-enacted by three other distinct legislative bodies, each one of which, composed of two or more branches, is entirely independent of all the others. These legislative bodies have thus manifested their concurrence and satisfaction in the sense expressed by the language of this law, when taken by itself, and without any other help than what may be derived from the nature of the subject of what it speaks. Surely then, if it would be at all unsafe to collect the sense of a law from the history of the changes it underwent in one branch of a legislative body; because, that history might not be known to the other; or because, the other might have had a different understanding of the matter, or been influenced by motives peculiar to itself, it would be wholly unjust, and improper to collect the sense of this act of incorpora *154 tion from the proceedings, or debates of any one of the four independent legislative bodies, by whom it has been adopted. And, if the grave and solemn movements of the several legislative bodies themselves, by whom it was passed, cannot be considered as altogether safe guides in ascertaining its meaning, most assuredly the resolutions of the various assemblages .of people, who have met at sundry times to consult -about ‘this great enterprise/ with all the unofficial sayings-and doings in relation to it, which have been so much pressed upon the attention of the court, milst be utterly rejected, as absolutely unworthy of any the slighest respect or attention whatever.
It would be of dangerous consequence to admit parol proof of an intention in the law makers, different from that manifested by the words of the law itself; as to shew, that a duty which the act of Assembly called a port duty, was intended to be a fort duty, (m) In construing a legislative enactment, a court of justice cannot regard the resolutions, orders, dr propositions entered upon the journals of either branch of the legislative department; but must look to the statute book alone, the words of which must speak for themselves; nor can it consider the motives which may have influenced the legislature any further than they are manifested by the language of the statute itself. A judge must form his judgment of the meaning of the legislature as if the case hád been brought before him by demurrer, in the consideration and determination of which no evidence can be admitted; yet, in all such cases he may well inform himself from dictionaries or books which treat on the particular subject; in doing so, however, such authorities are not to be regarded as mere evidence, but only as the grounds of his judgment, as if he were to cite authorities illustrative of the,opinion he delivers, (n)
The provisions of the act incorporating The Chesapeake and Ohio Canal Company, upon the true construction of which the present question turns, relate only to the termination of a great work which that corporation is to cause to be executed; and the matter to be decided is, where that termination was intended to be; or whether that body politic has been restricted to any given space or *155 place within, or at which their work must terminate. The great, the sole' purpose of this act is to cause a navigable canal to be made ‘from the tide of the river Potomac, in the District of Coumbia,’ over to the river Ohio; and this act of incorporation must be construed with reference to that great object, so far as regards the matter now under consideration, (o)
The termination, now in controversy, is no otherwise described than by the expression, ‘from the tide of the river Potomac, in the District of Columbia’ The tide, thus designated, is a large space; and the surveys, which have been exhibited in this case, demonstrate, that it is perfectly practicable to extend this canal along, and to terminate it at any one point of the whole of this space of tide. The canal may be stopped precisely at the head of tide; but this, it is admitted, would not be altogether correct, or certainly not for the best. It is said, that it should descend to, and be terminated at good practicable tide navigation. Again, it is cleai-, that the canal may be conducted up the valley of Rock creek; and, so round Washington, to the Eastern branch, and enter the tide near Bladensburg; or thence, descending along the left bank of that river, it may unite with the tide opposite or below Washington. This, however, it is pronounced with one voice, and at once, would be absurd. I admit it to be so. But it is nevertheless, a very illustrative absurdity. It clearly shews, that the phrase here used is neither to be taken literally, nor wholly without limit; but must, of necessity, be controlled by the nature of the subject spoken of. A termination exactly at the first tide to be met with among the rocks at the foot of the falls; or in the shallow tide1 near Bladensburg, it is confessed by all, would be injurious ; and an union, by a great circuit, with the bold, deep tide which washes the left margin of the Eastern branch, or the Potomac river, it is declared would be absurd.
There is, therefore, a large range of the tide at which this canal might be terminated, that must be rejected. The tide spoken of, it is evident, is circumscribed to a given place, a pool to which the canal ought to come, and beyond which it ought not to be allowed to go. Rejecting then, all that space of the tide of the District of Columbia,'within which it would be confessedly inconvenient or absurd to fix upon as a termination for it, it will be necessary to *156 look into the nature of the subject itself to ascertain whether there are any principles of canalling which may, at this day, be considered as the settled common law in regard to the termination of canals of this description, that indicate the point at which this canal must be terminated.
For this purpose it will be necessary, to understand what it is that constitutes a port; to notice what is called improved river navigation, in contrast with proper canal navigation; and to shew where and how, by a kind of common consent, all canals of this description have been terminated. The circumstances which will be mentioned in relation to these matters, are such as are of universal notoriety; and as are always recurred to as furnishing an illustration of the causes which have always brought marine as well as canal navigation to a termination at particular places; so that the nature of the subject treated of in this law, and the principles by which it should be construed may be fully understood. Recollecting as we proceed, that all doubtful points are decided by an application of general principles to the particular case, (p)
According to one of the most venerable of our legal authorities, a port is a place for arriving and unlading of ships and vessels. It has a city or town, called the head of the port, for receipt of mariners and merchants, ánd the securing and vending their goods, and victualling their ships. So that to constitute a port, it must be a place to which vessels may have easy access from sea, and where they may lie in safety; and there should be houses and suitable accommodations for mariners and merchandize as well as a harbour for ships. But it sometimes happens, that the town, or the head of the port, as it is called, is at some distance from the port itself. This however, is always attended with great incon-' venience; and, therefore, in many instances, where it was practicable, the navigation has been extended at an enormous expense to the town or head of the port, (q) Anciently, the natural navigation of the river Ex, in England, was such, that large ships went quite up to the city of Exeter; but a malicious earl of Devon, by throwing dams across the river, entirely choked the channel, so that ships were obliged to stop four miles below, which place was, for a long time, considered as the port. But at great expense the obstructions were removed, and now ships again find *157 a port at the walls of the city, (r) The city of Chester, in England, is situated on the river Dee, the crooked channel of which had become so choked up, by washings from the land, that ships were obliged to make a port eight miles below. But some time since, a new channel was cut for the river near the old one, and at a vast expense, and ships now again go up to the port at the city, (s)
The Severn, among the rivers of England, has, of old, been denounced as £a most wild unruly river;’ its descending floods have, at various times, swept along with such violence, and carried with them such masses of earth as entirely to fill up the former, and excavate an altogether new channel in many spaces ; and such is the rage and impetuosity of the tide, whether of flood or ebb, that no vessel ventures up it farther than King Road, near its confluence with, the Avon, without a pilot. (t) The chief ports on this river and its branches are Bristol and Gloucester, up to each of which the tide flows; but to overcome the dangers and difficulties of the natural access to them has called forth the most powerful efforts of human ingenuity, and the expenditure of immense sums of money. About seventy acres of the old and crooked course of the Avon was to be converted into a vast dock at Bristol, into which ships were to be lifted by locks; and into which also the boats of the Kennet and Avon canal were to be admitted. And a canal has been constructed for the passage of ships, seventy feet wide and eighteen feet deep, from Berkley to Gloucester, a distance of eighteen miles along the valley of the river, (u)
These and a number of other examples, that might be given, may be regarded as extensions of tide navigation, so as to have a port immediately at the city which is the seat of the commerce. The dangers, difficulties, and delays of the natural tide navigation, in some cases, and the expense and delay of transhipments and of land transportation, in others, however short, were so very great as to demonstrate the necessity and utility of having the port and the town, or head of the port, immediately together. The termination of marine navigation, in relation to the matter now under consideration, therefore, is not, in any case, the most interior tide on which a ship may safely float; but it is uniformly the port at which, owing to a variety of concurring circumstances, artificial *158 and natural, she must stop; because the object of her voyage must there end.
There is a material difference between legislative enactments relative to the formation of an improved river navigation, and those in relation to proper navigable canals; because of the material difference between the two subjects. The forms and modes of the two kinds of navigation, are essentially different; and therefore, inferences and principles, fairly deducible from, or applicable to one, cannot, with any propriety, be made from, or to the other.
The river Thames, in England, is navigable above London, for a considerable distance; and the vessels, which pass up it, are all provided with a self-moving power; many of them have a horse on board, to be sent out for towing when it can be done. Sails are used, where an opportunity offers, and where not, they use oars, or setting-polls. For some spaces they have the privilege of a towing path on the bank, from which the horse is made to tow the boat; and in other spaces the horse is driven into the river, to wade along, and drag the boat after him. On the river Severn, in England, a towing path, from which vessels are drawn along up or down the river, is claimed by custom and has been confirmed by statute, (v) In some spaces of river navigation, the vessel is lifted up, or let down into short canals, and thus passed by innavigable rapids; in others, its safe passage is secured by means of dams, sluices, or cuts. The whole course of river navigation is irregular in its modes of movement; but the vessel proceeds throughout by having with it, from the very port, whence it sets forth, a moving power suited to each mode of navigation, either of which may be used according as it may be most beneficial; and that too, through a wide, deep, and occasionally a rapidly descending stream. The act incorporating The Potomac Company, furnishes a complete example of river navigation. By that act the rapid headlong river Potomac, above tide, was to be made navigable; its falls were to be surmounted by locks and canals; its ripples were to be opened by cuts; and its shallows were to be cleared so that boats might pass up or down with safety.
Proper canal navigation is uniform in its movements and limited to one kind of propelling power; that is, by means of a towing path; and it is rarely, or ever permitted to use any other. The *159 vessel itself is built and laden just so as to float upon still water, unagitated, and without a ripple or wave. All which gives to this form of transportation a peculiarity of character, which renders it necessary, that the canal, for which it is alone and exclusively adapted, should terminate at that point where it meets the marine navigation; since the merchandise cannot, as in the case of river navigation, reach the port, unless the canal be extended to that point, otherwise than by transhipment into other vessels, or by land transportation.
Hence it is obvious, that a boat, properly prepared for river navigation, would not only be fitted to encounter the tide navigation from the port to the very foot of the falls, but that portion of her voyage would be, in all respects, the safest and easiest. And, therefore, it was, that the act incorporating The Potomac Company, the purpose of which was to open a river navigation, specified, that improvements should commence ‘above tide water.’ But to a proper canal boat the tide water portion of her voyage would be the most perilous, or require a preparation and out-fit entirely useless through all the rest of her passage. There is, therefore, no just foundation for the position assumed in the argument, that the same termination on tide would be alike well adapted to these two different modes of navigation.
There are many canals which facilitate marine navigation, or in an indirect manner contribute largely to the gathering together commodities for foreign commerce, which are, however, in their general character, and in the objects of their terminations very unlike the one under consideration. Of the canals of this description are those which have been constructed as thoroughfares, for sea vessels, from one sea or bay to another, across a long narrow peninsula. Such as the canal of Kiel, in Denmark; (w) the Caledonian canal, the Forth and Clyde canals of Scotland; and the Chesapeake and Delaware canal of our own country. There are, in England, several canals, which have been constructed solely for the purpose of transporting sand, sea-weed, and shells, ‘for bettering of their lands,’ from the sea shore into the interior; (x) the terminations of which have no concern with marine navigation. In the island of Great Britain there are, besides a great number of canals, from coal mines and quarries to towns'; and from one city to another. These and all such lines of canals, furnish no imme *160 diate illustration of the point under consideration, further than, as the numerous instances in which they have been continued by tunnels through high ridges, where water could be had to supply the summit level, shews, that it has been universally, and every where found necessary to continue the canal line of transportation unbroken and without the least interval, where it was, at all practicable to do so, even at the greatest expense.
The great object of The Chesapeake and Ohio Canal is to facilitate the transportation of the productions of the interior of our country to' the £ tide-water of the river Potomac in the District of Columbia; ’ and, consequently, those canals only, of other countries, and places, which have a similar object in descending from the interior to the tide, can afford any correct illustration as to the point of termination, on tide, which should be given to this canal. In selecting the instances, for this purpose, I shall coniine myself to those of Great Britain, and of this country, as being best known, and amply sufficient for all the purposes to which I deem it proper to pray in aid such examples.
The object of the Aberdeen canal, which is nineteen miles in length, was the exportation of granite stone, from the famous quarries on the banks of the river Don; and for that purpose the canal has been made to terminate in the port of Aberdeen. The Glenkin canal was intended to facilitate the exportation of coal, lime, iron ore and other minerals; and it terminates in the tideway of the port of Kirkcudbright. The Glamorganshire canal is twenty-five miles long; and its objects are the exportation of the produce of the immense iron, coal, and lime works in the interior. It terminates in the river Severn near Cardiff, where there is a floating dock "sixteen feet deep, in which a great number of ships of three hundred tons burthen can be constantly afloat, and load or unload, either at the- spacious warehouses on its banks, or from or to the boats belonging to the canal. The Swansea canal, having a similar object, has a similarly advantageous termination and meeting with the marine navigation.
The Stroudwater canal, and the Thames and Severn canals leading through various others over the interior and across England, are connected with the ship canal leading into the port of Gloucester. The Kennet and Avon canal, which is stretched across England to London, terminates in- the great ship basin at Bristol. The Chester canal proceeds from the very port to form connexions with the canals of the interior. The Mercy and Irwill navigation, *161 as it is called, has for its appendage the famous Wet Docks of Liverpool. This navigation is formed by inclosing and straightening a portion of the river itself for a considerable distance above Liverpool, like a proper canal, and is a still water navigation. The Bridgewater and several other of the principal canals, from the interior, are connected with this canal. The Leeds and Liverpool canal passes several of the principal manufacturing towns, and with others crosses England entirely in several directions. This canal terminates at Liverpool, and the cafral boats deliver their cargoes of coal there, on a steep hill-side, so that it slides down into a yard on the water side of the harbour. (y)
The Lancaster canal is seventy-five miles in length, and the greater portion of its northern part skirts along near the sea-coast. Its objects are the interchange of the lime-stone of the northern parts for the coal of the southern, the supply of Lancaster, Preston, &c.; and yet. those ports are accessible from the sea. This canal has an opening to the sea by a short cut near Lancaster. The Edinburg and Glasgow canal passes entirely across Scotland. This canal begins at Lieth in the port of Edinburg and ends in the tide-way of the Clyde in the town of Glasgow. It is also connected, by means of the MarHand canal, with the Forth and Clyde canal, which has a convenient port at each of its terminations; and it is besides connected with the Saltcoats canal which terminates on the sea-coast to the south of the Clyde, where a secure basin has been constructed for the reception of ships and canal boats. At the port of Armyn, on the tide of the river Ouse, a branch of the Humber, the Ayre and Calder navigation terminates; where the canal boats from Liverpool, or the interior meet sea vessels of one hundred and fifty tons burthen. The tide flows in the river Thames to Richmond, a distance of sixteen miles above London, and affords perfectly safe navigation for small vessels; yet the Grand Junction canal, which is connected with the principal canals of the interior, passes down near this tide navigation, and terminates at Padding-ton, immediately contiguous to London, where, for its connexion with the river it pays an annual tribute to the city. Had it been practicable to obtain, by any reasonable means, an adequate supply of water, this Grand Junction canal would have been extended through the city itself into the London docks at Wapping. (z)
From this review of the canals of Great Britain it appears, that *162 all of them, which have been, in any manner, intended to contribute to the marine commerce of the nation, have not merely been carried to and immediately connected with the very first safe tide-navigation to be found; but have been conducted down into the very ports themselves. The ports of a nation are its great gates; and therefore all canals have gone there to meet, assist in, or contribute to the commerce of the country. And in order, that this may be effected to the greatest advantage to all, it is essentially necessary, whatever may be the cost, as well, that the sea vessel should be enabled to have access to and make a port at the city or great commercial depot itself; without any break in the continuity of her voyage, as that the canal vessel should also be enabled, without any interruption in her course, to meet the sea vessel in the same port or pool, and interchange cargoes with her.
The propriety of extending a canal along parallel with, and near to tide water navigation has often been a matter of doubt, and, in some instances, it has been made a subject of ridicule. The Southampton and Salisbury canal of England, passes for some miles along the bold deep tide of the Southampton water, into the very port of Southampton itself. From its skirting along close to the shore of that river it was, that that facetious satirist Peter Pindar took occasion to burlesque ‘Southampton’s wise sons.’ But notwithstanding doubt and ridicule, the propriety and necessity of conducting canals of this description into the very port itself, has, in Great Britain, been practically demonstrated in the most satisfactory and conclusive manner; and become established as the settled common law of canalling.
But it may be said, that although, in Great Britain, it may be considered by all as essentially necessary, that the canal and marine navigation should be conjoined in the port itself; yet unless it shall appear, that such has been also considered in this country, as the principle upon which such a canal should be terminated, there can be no presumption, that the legislators who passed this act of incorporation so understood the matter; or spoke of a canal the termination of which must be in a port. To shew what was the universal understanding in this country, in relation to this matter, a few instances will be sufficient.
The great Erie canal of New York, in descending easterly, after receiving the Champlain canal, passes close along side of the tide of the North river, in which there is good sloop navigation, for a distance of seven miles, to Albany, where it terminates in a basin, *163 from which the canal boat may hand over her cargo immediately into a sea-vessel. In extending over to the west, it passes through a large artificial harbour, constructed at Black Rock, into which the canal boats, and the lake vessels may both enter and interchange cargoes, and then terminates at the port of Buffalo on lake Erie. The Massachusetts canal, instead of stopping at the head of tide, where the navigation is good, is carried close alongside of it, four miles further, into the harbour of Boston. The boats navigating the river Santee could only reach their great market, by passing out of it, and some distance along the sea coast. To save them from this exposure and risk, a canal was constructed from the Santee into Cooper river, so as to bring them directly into the harbour of Charleston. And speaking of the river navigation of the upper Potomac, of which the lower piece of canal constitutes a part, and was only intended to enable boats to surmount the first impassable falls, it has been said, ‘that the legislative impartiality, which has required the canal to enter the river, at the very head of tide, in order that Virginia may have an equal chance of becoming the depot of its commerce with Maryland, has very much injured its utility to the country at large.’ (a) From these examples it satisfactorily appears, that here, as in Great Britain, it has been universally understood, that canals, intended to co-operate with marine navigation, must be terminated in the very port itself, where the marine navigation, in like manner ends.
The specified and known objects of a canal give to it that which may be called its peculiar character, and shew to what class it belongs. All canals of that class which are intended to facilitate the transportation of the productions of the interior to tide for exportation ; and of the importation of foreign commodities by the same route, must terminate at the port or point where alone the two forms of transportation can conveniently meet. The Chesapeake and Ohio Canal is intended to be one of this character; and therefore, it must have such a termination, unless it be otherwise expressly provided by law.
This canal is described in the preamble of the act of incorporation, and in its twentieth section, which recognizes and affirms that given in the preamble. In these provisions we have the objects of the great work distinctly specified. They were to establish a *164 connected navigation between the eastern and western waters, so as to extend and multiply the means and facilities of internal commerce, which would produce the happy results set forth. And the route which it was to take, up the valley of the Potomac, and thence over to the Ohio, is specified by the declaration, that it is ‘to be fed through its course, on the east side of the mountain, by the river Potomac, and the streams which may empty therein; and on the western side of the mountain, and passing over the same, by all such streams of water as may be beneficially drawn thereto by feeders, dams, or any other practicable mode.’ The terminations are described by a reference to the great object expressed, of ‘a connected navigation between the eastern and western waters.’ Our eastern tide waters are navigated by ships and marine vessls to the ports, or highest point of convenient tide navigation; and our western waters are navigated to great advantage, and chiefly by steam-boats. These two forms of navigation, it is proposed to connect together by one unbroken line of canal; and the terminations of this new artificial connecting line of navigation are specified accordingly, with a distinct reference to the pre-existing modes of navigation. ‘A navigable canal from the tide water of the river Potomac in the District of Columbia,’ passing along the route indicated, ‘to the highest steam-boat navigation of the Ohio river, or of some one tributary stream thereof.’ (b)
Here we find the western termination specified' by designating the kind of vessel which the canal boat must be enabled to meet there; she must have it in her power to lay along side of a steamboat in the waters of the West; and thus the connexion with those waters was to be formed. Hence it is manifest, that the connexion with the eastern waters was to be formed in like manner; that is, that the canal boat should be enabled to meet a ship, by which kind of vessels alone the tide waters of the east are navigated. The new line of navigation would then, indeed, form a full and complete connexion ‘between the eastern and western waters;’ which could be so effected in no other way. The naming of the steam-boat clearly shews, that it was the intention of the legislators, by this law, to provide a mode of transportation from the one to the other of those two classes of vessels, which were then so profitably navigating the great rivers of our country. They intended, that the canal boat should be enabled to pass *165 over the whole space, from the ship of the east to the steam-boat of the west. It is not said, that the western termination shall be at the highest point to which a steam-boat may go, but, ‘to the highest steam-boat navigationthat is, to the highest point at which such vessels usually go, and where they make their port. And so, as to the eastern termination, the canal boat is to meet a ship; but that kind of vessel is hardly ever found at the highest point of tide, to which she may go, but at the highest port. And therefore the canal must necessarily be extended down to the port; since the ship can meet and have intercourse with the canal boat no where else.
It is universally understood, that all canals, which have for their chief object the exportation of ponderous and cheap commodities, in co-operation with marine navigation, must be extended into the very port itself. But, in this instance, more is expected; and therefore, there is, if possible, an increased necessity for extending this canal into the very port. The greatest and most important political results, it is declared, are expected to flow from connecting, in this way, the navigation of the east with that of the west; and hence, it must have been intended, that the connexion should be made in the most complete and perfectform; that there should, if possible, be not the least break or interruption in any part of the whole line from the ship of the east to the steam-boat of the west. Five miles of land transportation would cripple the intercourse most prodigiously; thirty miles of land portage would destroy the line of connexion totally.
Taken in this point of view, this law, by calling for a beginning of this canal ‘from the tide water of the river Potomac, in the District of Columbia,’ must be construed to have a reference to one, or to all of the three ports on that tide, at which the marine navigation ends. A different construction would confessedly allow of a termination, that might be greatly injurious, or even absurd; one which might mar the whole project, by stopping the great mass of ponderous canal borne commodities some miles short of their destination, there to be taken up and moved on again in another form. But it is manifest, from the nature of the subject provided for by this law, that the chief port of the District of Columbia must have been contemplated as the most suitable eastern termination of this canal. Whence this court is perfectly satisfied, that this company not only have a right, but that it is their duty to extend this canal into the port of Washington, as being the most *166 central, and the chief port or pool of that space of tide in the District of Columbia, specified by their act of incorporation, as the point of its eastern termination. And consequently, that all expenditures of the corporate funds, in order to carry it down into the port of the city of Washington, at Rock creek, or elsewhere within that port, are legitimate, and cannot be prohibited by injunction.
Upon the whole, I feel perfectly well satisfied, from the facts and circumstances disclosed by these pleadings and exhibits, supposing them to have been presented as between proper parties and in the most correct form, that there is no ground whatever for granting, renewing, or continuing any injunction against The Chesapeake and Ohio Canal Company.
Whereupon it is Ordered, that the injunction heretofore granted in this case be and the same is hereby annulled and dissolved. And it is further Ordered, that the attachment heretofore awarded in this case be and the same is hereby quashed with costs.
It appears from an inspection of the docket entries as late as the 1st of January, 1839, that after this order no further proceedings had, up to that time, been had in this case.

 Anonymous Gilb. Eq. Rep. 84; Danby v. Lawson, Prec. Chan. 110; Anonymous Prec. Chan. 3314 Anon. 2 Atk. 507; Studd v. Acton, 1 H. Blac. 468; Morris v. Hayward, 1 Com. Law Rep. 485; Hurd v. Partington, 1 Exch. Rep. 358; Com. Dig. tit. Bail, F. 8.

 Anonymous Pra. Chan, 331; Anon. 2 Atk. 507.

 Rex. v. Daws, 2 Salk. 608; Forum Rom. 70, 82, 1785, ch. 72. s. 23; Cowell v. Seybrey, 1 Bland, 18, note; Bryson v. Petty, 1 Bland, 182.
Lee v. Sweetman, 1713. — Ordered, that an attachment of contempt issue against the sheriif for not returning his writs of attachment against the defendant. — Chancery Proceedings, lib. P. L. fol. 11.
Bladen v. Forbs, 1713. — Ordered, that attachment of contempt issue against the sheriif for not having the defendant’s body in court according to the return of the writ. — Chancery Proceedings, lib. P. L. fol. 12.
Wallace v. Boteler. This was a bill filed on the 5th of August, 1797, to foreclose a mortgage of real and personal estate.
May, 1789. — Hanson, Chancellor. — Ordered, that the sheriif of Prince George’s county bring into court the body of the defendant -on the twenty-third day of May instant, he being by the said sheriif returned ‘attached,’ to answer in this case.
The defendant having failed to answer, and not having been brought into court, the case was again brought before the court.
18th July, 1798, Hanson, Chancellor. — The sheriif of Prince George’s couniy having failed to bring into court the body of the defendant, agreeably to the tenor of the order for that purpose passed, during the present term, and regularly served upon him. It is thereupon adjudged and ordered, that Hotly Maddox, the sheriif aforesaid, be and he is hereby, on motion of the complainant, amerced the sum of twenty pounds current money; unless he shall bring into court the body of the said defendant on the first day of next October term; provided that a copy of this order be served on the said sheriif any time before the first day of September next.
After which, the defendant answered, and a decree was passed by consent for a sale of the personal estate only, &c.
*102 Watt’s creditors v. Campbell, trustee. — 8ih July, 1808, Kilty, Chancellor. — On motion of the counsel of Winand, in whose hehalf the order of which the within is a copy was made; and it appearing by the affidavit, that the said order was served, which was not obeyed. It is ordered, that the sheriff of Charles county be amerced in the sum of £75j; and the further sum of £10, for a fine for the contempt and costs; unless he shall bring into this court the body of J. Campbell, trustee for the sale of the real estate of E. Watts, deceased, being the same person mentioned in the order, of which the within is a copy, on some day during the sitting of the court, at September term next.
After which, on motion of the counsel for J. Winand, this matter was again brought before the court.
27th October, 1808. — Kilty, Chancellor.— Ordered, that the amercement in the order of July 8th, 1808, be no longer continued; hut be and the same is hereby adjudged to he final’; the said sheriff T. A. Davis not having brought into court the body of J. Campbell therein mentioned, according to the tenor of the said order— and it is further ordered, that the said sheriff T. A. Davis pay to the said J. Winand, on or before the 15th of November next the said amercement, being £75 and costs; and do also pay the fine for contempt, being £ 10.
An affidavit of the service of this order was made on the 25th November, 1808; and Winand by his petition filed on the 2d December, 1808, prayed for a ca sa.
2d December, 1808. — Kilty, Chancellor. — Let a ca.sa. issue as prayed to the coroner of Charles county, returnable to the first day of the ensuing term.

 Jackson v. Petrie, 10 Ves. 165; Birmingham Canal Comp. v. Lloyd, 18 Ves. 515; Crowder v. Tinkler, 19 Ves. 622; The Mayor of Colchester v. Lowten, 1 Ves. & B. 246; Agar v. The Regents Canal Comp. Coop. 78 ; Mayor of King’s Lynn v Pemberton, 1 Swan. 250.

 Rundell v. Murray, 4 Cond. Chan. Rep. 148.

 Wright v. Nutt, 1 H. Blac. 154; Blakemore v. The Glamorganshire Cana Navigation, 6 Cond. Chan. Rep. 551.

 Jones v. Magill, 1 Bland, 182.

 Anonymous, 1 Vern. 120; Schermehorn v. L’Espenasse, 2 Dall. 364; The State Georgia v. Brailsford, 2 Dall. 405.

 Wilson v. Wilson, 1 Desau. 224.

 Penn v. L. Baltimore, 1 Ves. 446; 2 Mad. Chan. 301.

 1824, ch. 79.

 1 Blac. Com. 475.

 Fawkes v. Pratt, 1 P. Will. 593; Windsor v. Windsor, 2 Dick. 707.

 Savory v. Dyer, Arab. 70 ; Davile v. Peacock, Barnar. 27; Jesus College v. Bloom, 3 Atk. 262.
Brannock v. Moll. 1720. — For the want of a prayer in the bill for an injunction ; and sufficient bond not being given, the injunction is dissolved. Eule answer by next term. Afterwards the complainant by his attorney prays the bill in this cause may be withdrawn, and that the suit may surcease on the said bill, which is accordingly granted with costs to the defendant. On payment of costs, or good security given therefor, the new injunction brought is to be proceeded on. — Chancery Proceedings, lib. P. L.fol. 499.

 Gilb. Com. Plea. 234; Road Company v. Creeger, 5 H. & J. 124; Bosley v. The Susquehanna Canal, 21 April, 1829, post.

 Bliss v. Boscawin, 2 Ves. & B. 102; Eden Inj. 87; Pratt v. Archer, 1 Cond. Chan. Rep. 221; Davis v. Davis, 2 Cond. Chan. Rep. 526; Powell v. Lassalette, 4 Cond. Chan. Rep. 260.

 Coppin v. Coppin, Select Ca. Chan. 30; S. C. 2 P. Will. 295; Salmon v. The Hamborough Company, 1 Ca. Chan. 204; Meliorucchi v. Royal Exch. Assu. Comp. 1 Eq. Ca. Abr. 8, p. 8; Johnson v. Mills, 1 Ves. 283; Ward v. Northumberland Anstr. 477; Rann v. Hughes 7 T. R. 350, n.; Lyle v. Rodgers, 5 Wheat. 407.

 Salmon v. The Hamborough Company, 1 Ca. Chan. 204.

 Harris v. James, 3 Bro. C. C. 399; Done v. Read, 2 Ves. & B. 310; Cooke v. Westall, 1 Mad. Rep. 265; Cope v. Parry, 1 Mad. Rep. 83; Griffiths v. Wood, 11 Ves. 62; Pieters v. Thompson, Coop. Rep. 249.

 Jones v. Magill, 1 Bland, 177; Onion v. McComas, ante 83, note.

 Anonymous, 1 P. Will. 300; Whitworth v. Davis, 1 Ves. and B, 549; Jones v. Magill, 1 Bland, 198; Lingan v. Henderson, 1 Bland, 267.

 Mestaer v. Gillespie, 11 Ves. 636.

 Drew v. Harman, 2 Exch. Rep. 256.

 Just. Inst. lib. 3, tit. 6, s. 7.

 1719, ch. 15. Repealed by 1832, ch. 56.

 Bealey v. Shaw, 6 East, 208; Palmer v. Mulligan, 3 Caine’s Rep. 307; Beissell v. Sholl, 4 Dall. 211.

 3 Blac. Com, 219; Hale de Port. Maris, 59, 60; Blessett v. Hart, Willes Rep. 508.

 Ex parte O'Reily, 1 Ves. jun. 114. The Vauxhall Bridge Company v. Spencer; 2 Mad. Rep. 355. S. C. 4 Cond. Chan. Rep. 28.

,) 1824, ch. 79, s. 15.

 1824, ch. 79, s. 19.

 Vernon v. Blackerby, 2 Atk. 145; Ex parte Vennor, 3 Atk, 770; Rex v. Inhabitants of Flecknow, 1 Burr, 465; Hughes v. Trustees of Modern College, 1 Ves. 188; Agar v. The Regents Canal Company, Coop, Rep. 78.

 1784, ch. 33, s. 13.

 1824, ch. 79, s. 13.

 Curson v. African Company, 1 Vern. 121; 1785, ch. 39; 1801, ch. 104.

 1784,ch. 33, &c.

 1784, ch. 33.

 The power has been since granted to sell surplus water for mills, &c., so that such sales do not diminish the water in the bed of the river to the injury of the water rights of any individual and so that no part of any such surplus shall be applied any where within the state of Maryland, to the manufacture of any description of grain. Therefore the water power of the canal, within the District of Columbia, may now be disposed of for all manufacturing purposes, 1832, ch. 291; Acts of Congress 3 March, 1837, ch. 51.

 1824, ch. 79, s. 16.

 Fishmonger Company v. East India Company, 1. Dick. 164; Ripon v. Hobart, 8 Cond. Chan. Rep. 331.

 1784, ch. 33, s. 13.

 In. a report made on the-30th of January, 1827, by a committe to the House of Representatives" of Congress, No. 90, page 27, it appears, that John Balendine, in a communication published in 1773, says, he had had an experience of more than tif.teen years in transporting merchandize up and down the river. And in page 73 of the same report, it is said, that the Ohio company of Maryland and Virginia in 1749, used the river for transportation.

 Hale de Port. Maris 86; Nicholson v. Chapman, 2 H. Blac. 254; Miles v. Rose, 1 Com. Law, Rep. 240.

 ‘.The Potomac is the most rapid of the great atlantic rivers,’ per Gallatin’s Rep. 1808, page 31.

 1768, ch. 5; 1806. ch. 79.

 Buszard v. Capel, 13 Com. Law, Rep. 379; Palmer v. Mulligan, 3 Caine’s Rep. 307; Shaw v. Crawford, 10 John. Rep. 237; Hooker v. Cummings, 20 John. Rep. 90.

 1784, ch. 33.

 1824, ch. 79, s. 13.

re) 1784, ch. 33, s. 10.

 Hale de Jure Maris, 9.

 Kame’sPri.Eq. b. 1, pt. 1, c. 1, s. 1.

 1784, ch. 33, s. 11 and 13.

 Vattel, b. 1, s. 249, 272; Bealey v. Shaw, 6 East. 208 ; Weld v. Hornby, 7 East. 195 ; Williams v. Morland, 9 Com. Law Rep. 269; Wright v. Howard, 1 Cond. Chan. Rep. 95; Coulter v. Hunter, 4 Rand. 58; The river Delaware, between Pennsylvania and New Jersey, 49 Niles’ Reg. 110,298.

 1785, ch. 1; Tuck. Blac. Com. pt. 1, app. 310.

 1784, ch. 33, s. 19.

 Instructions to the Commissioners of Maryland, Votes and Pro. H. Deleg. 22 Dec. 1777; 1784, Resol. 22; 1785, ch. 1.

 Vattel, b. 1. c. 22; The Twee Gebroeders, 3 Rob. Ad. Rep. 339; Wright v. Howard, 1 Cond. Chan. Rep. 95; Handly’s lessee v. Anthony, 5 Wheat. 379, Land-hold. Ass. 170.

 Chart. Maryland, s. 3.

 This mode of designating the sides of our long and winding rivers is much more generally accurate than that used in the Charter of Maryland, or than that of north or south, east or west, and has for its sanction the highest classical authority. The river is personified and supposed to be looking and moving towards its outlet, when its banks are on its right and left hand; and, in reference to that supposition, they are so designated accordingly. Thus Horace, speaking of the Tiber says :
‘Iliac dum se nimium querenti Jactat ultorem, vagus et sinistra Labitur ripa, Jove non probante,
uxorius amnis’ — Cam. lib. J. od. 2.
Gibbon says, ‘If we inquire into the present state of those countries, we shall find, that on the left hand of the Danube,’ &c. 1 Gibbon Deck of Rom. Emp. 26. Phil. Ed. And again he says, ‘He was deprived of the country on the right of the Tiber.’ 5 ib. 170.

 1822, ch. 54.

 Landhold. Ass. 173. Proce. Conven. Maryland, 30th October, 1776; Resolutions 1785, No. 1; 1795, No. 3 ; 1796, No. 5; 1801, No. 10; 1806, No. 10; Foster and Elam v. Neilson, 2 Peters, 307; 3 Jefferson’s Correspondence, 347; Votes and Proc. H. Del. 24th January, 1824.

 1784, ch. 33, s. 13, 19.

 The King v. The Glamorganshire Canal Company, 12 East. 157. S. C. 14 Com. Law. Rep. 112; Blakemore v. The Glamorganshire Canal Navigation, 6 Cond. Chan. Rep. 544; Groszler v. The Corporation of Georgetown, 6 Wheat. 593.

 1784, ch. 33, s. 11.

 Vanhorne’s lessee v. Dorrance, 2 Dall. 318.

 Keppell v. Bailey, 8 Cond. Chan. Rep. 118.

 1784, ch. 33, s. 13.

 ‘One great and fatal error has been interwoven into the scheme of the other canals, excepting only that of the Potomac. They have been dug as much with a view to the erection of mills, as to the purposes of navigation. To fit them for millraces, their descent is rapid, and their current strong. They are liable, of course, to the variation of the quantity of water in the river; they bring down with their current, the alluvium of the river; bars are formed in them, as well by this alluvium, as by the land wash; and their banks, where they are not of rock, or walled, are liable to perpetual wear by the current. The canal is, besides, itself an inconvenient rapid to those who would ascend it.’ — Per Latrobe, Report of A. Gallatin, Secretary of the Treasury, on Roads and Canals, 1S08, page 86.

 The Bridgewater Canal, and the Dearne and Dove Canal, in England, have tumbling bays, and guage wiers for mills, and for watering meadows. — Rees’ Oyelo. art. Canal.

 1784, ch. 33, s. 17.

 Godwin’s Pol. Just.b. 3, c. 3.

 Tacitus Ann. b. 1, s. 75.

 Vattel, b. 1, c. 20, a. 244

 Blakemore v. The Glamorganshire Canal Navigation, 6 Cond. Chan. Rep. 550.

 1783, ch. 23, s. 6.

 1796, ch. 17.

 Dudley v. Dudley, Prece. Chan. 249; Charlwood v. Morgan, 1 New Rep. 66; The Rebecca, 5 Rob. Ad. Rep. 104; Lingan v. Henderson, 1 Bland, 272.

.) 1 Ev. Pothier Ob. 472; 2 Ev. Pothier Ob. 119; 4 Stark. Evi. 1234.

 Attorney-General v. Middleton, 2 Ves. 328.

 1 Blac. Com. 481.

 Vattel, b. 1, s. 247.

 Co. Litt. 44. 300 ; Com. Dig. tit. Franchise, F. 18.

 Adley v. The Whitstable Company, 17 Ves. 316. S. C. 1 Meriv. 107.

 The Charitable Corporation v. Sutton, 9 Mod. 350 ; S. C. 2 Atk. 400 ; Drewry v. Barnes, 3 Cond. Chan. Rep. 311.

 U. S. Bank v. Planters Bank, 9 Wheat, 907; Towson v. The Havre de Grace Bank, 6 H. & J. 52.

 Child v. Hudson’s Bay Company, 2 P. Well. 207; Attorney-General v. The Governors of the Foundling Hospital, 2 Ves. Jun. 43; The Mayor and Commonalty of Colchester v. Lowten, 1 Ves. & Bea. 226; Gray v. Chaplin, 1 Cond. Chan. Rep. 451; Bromley v. Smith, 2 Cond. Chan. Rep. 5; Blain v. Agar, 2 Cond. Chan. Rep. 19; Hichens v. Congreve, 3 Cond. Chan. Rep. 796; The People v. The Utica Insurance Company, 15 John. Rep. 358.

 1799, ch. 16; 1809, ch. 64; 1813, ch. 126; 1815, ch. 33; 1818, ch. 73 ; 1829, ch. 42, 67.

 Karae’s Prin. Eq. b. 3, c. 7.

 1785, ch. 72, s. 23, 25.

 Cartwright v. Pettus, 2 Ca. Chan. 214; Arglasse v. Muschamp, 1 Vern. 75; Kildare v. Eustace, 1 Vern. 419; Toller v. Carteret, 2 Vern. 494; Fryer v. Bernard, 2 P. Will. 261; Derby v. Athol, 1 Ves. 203; Penn v. Lord Baltimore, 1 Ves. 444; Roberdeau v. Rous, 1 Atk. 544; Foster v. Vassall, 3 Atk. 589 ; Ex parte Marchioness of Annandale, Amb. 80; Pike v. Hoare, Amb. 428; S. C. 2 Eden, 182; Cranstown v. Johnston, 3 Ves. 170 ; In the matter of the Duchess of Chandois, 1 Scho. and Lefr. 301; Lord Clive’s Jaghire, 1 Coll. Jurid. 181; Massie v. Watts, 6 Cran. 158; Guerrant v. Fowler, 1 Hen. and Mun. 4.

 Co. Litt. 19, 6; Drybutter v. Bartholomew, 2 P. Will. 127; Buckeridge v. Ingram, 2 Ves. Jun. 652; Ram. on Assets, 184.

 1827, ch. 61.

 1 Mad. Chan. 626; Kam. Pri. Eq. b. 3, c. 8, s. 3; Dixon v. Ramsay, 3 Cran. 319; De Sobry v. De Laistre, 2 H. & J. 224.

 Vattel, b. 2, s. 83; Kam. Pri. Eq. b. 3, c. 8, s. 2; Lord Clive’s Jaghire, 1 Coll. Jun. 188; Bligh v. Darnley, 2 P. Will. 622; Calvin’s case, 7 Co. 36; Robinson v. Bland, 2 Burr. 1079; The King v. The Dock Company of Hull, 1 T. R. 219 ; The Commonwealth v. Martin, 5 Mun. 120 ; Ex parte Horne, 14 Com. Law. Rep. 106;

 Drybutter v. Bartholomew, 2 P. Will. 127; The King v. The Aire & Calder Navigation, 2 T. R. 666; The King v. The Mayor of London, 4 T. R. 21.

 The Company of Merchant Adventurers v. Rebow, 3 Mod. 126: Jacob’s Law Dict. V. Turkey Company.

 1826, ch. 81; 1827, ch. 174; 1828, ch. 57 & 132; 1829, ch. 42.

 Nabob of the Carnatic v. East India Company, 1 Ves. Jun, 371; S. C. 2 Ves. Jun. 56.

 Henriques v. Dutch West India Company, 2 L’Raym. 1532; Attorney-General v. The Mayor of London, 3 Bro. C. C. 171; S. C. 1 Ves. Jun. 244; Barclay v. Russell, 3 Ves. 424; The National Bank of St. Charles v. De Bernalis, 11 Com. Law Rep. 475; The Society, &c. v. New Haven, 8 Wheat. 482 ; Agnew v. The Bank of Gettysburg, 2 H. & G. 479.

 Hepburn *148 & Dundas v. Ellzey, 2 Cran. 445 ; Bank U. S. Deveaux, 5 Cran. 90 ; The Corporation of New Orleans v. Winter, 1 Wheat. 91; U. S. Bank v. Planters’ Bank, 9 Wheat. 911; ante 109, note (q).

 Drybutter v. Bartholomew, 2 P, Will. 128, note.

 Kennedy v. Cassillis, 2 Swan. 322.

 The Charitable Corporation v. Sutton, 2 Atk. 406; S. C. 9, Mod. 356; Barnesly v. Powel, 1 Ves. 287; Coysgarne v. Jones, Amb. 613.

 1 Blac. Com. 91.

 Attorney-General v. Parker, 3 Atk, 576; Rex v. Varlo, Cowp. 248; Withnell v. Gratham, 6 T. R. 388; 5 Cruise Dig. tit. 33.

 O’Neale’s Case. — On the 20th day of December, 1794, the following resolution was propounded in the House of Delegates respecting Lawrence O’Neale, then a delegate from Montgomery county.
‘Whereas, John Hamilton, of Prince George’s county, did petition this General Assembly for an act to authorise the issuing of a patent on a survey made for him of a tract of land, in Prince George’s county, called Hamilton’s Purchase, containing two hundred and forty-eight and a half acres of land, stating that the record of the original patent thereof had been iost; and whereas, by a certificate exhibited with the said petition, signed by the register of the land office, it appeared by an entry-made in the margin of the record of the warrant on which the said survey was made, that a patent had issued; but that there was no record of the patent or certificate remaining in the land office; and whereas, Lawrence O’Neale, Esquire, a member of this house, after the exhibition of the said petition, and the reading and reference thereof to a committee for consideration, did malee application to the register of the land office for a warrant of proclamation to affect the land included in the said survey ; and this General Assembly being of opinion, that such conduct is a violation of the rights of the people of this state, and the duty of a representative,
Resolved, That the said Lawrence O’Neale be expelled, and he is hereby expelled from this house; and his seat as a delegate for Montgomery county declared to be, and it is hereby vacated.
Ordered, That the said resolution have a second reading to-morrow, that the said Lawrence O’Neale be furnished with a copy thereof, and that he have permission to be heard by counsel at the bar of the house; and that summonses issue for John Callahan and Henry Whitcraft, to appear at the bar of the house on to-morrow.
On the next day the house took into consideration the resolution respecting Lawrence O’Neale, agreeably to the order of the day; and, after hearing Mr. Pinckney at the bar of the house in behalf of the said Lawrence O’Neale, the question was put, that the house assent to the said resolution. — Yeas 29, nays 34. So it was determined in the negative.
On motion, the question was put, That this house do highly disapprove of the conduct of Lawrence O’Neale, Esquire, as a member of this house, in entering an *152 application at the land office for a proclamation warrant to affect the land of John Hamilton, after a disclosure of the facts existing in the said case by the petition of the said John Hamilton preferred to this house — Yeas 61, nays 2. So it was resolved in the affirmative.
Immediately after which an act was passed, reciting that, whereas, it may happen that facts may be disclosed by petitions preferred to the General Assembly, of which advantage may be taken, to the injury of the party petitioning; therefore it was enacted, that whenever a petition shall be presented to the legislature by any person to confirm his title, the claim of such person shall not be invalidated by any thing cantained therein, until the end of the session; provided that nothing therein contained should prevent or delay a suit or execution. 1794, ch. 45.

 Weale v. West Middlesex Water-Works Company, 1 Jac. & Walk. 371.

 Arth. Blackamore’s case, 8 Co. 314; The Earl of Shaftesbury’s case, 1 Mod. 153.

 8 Anne. c. 19.

 Millar v. Taylor, 4 Burr. 2305.

 The King v. Pasmore, 3 T. R. 245; Blac. Com. 68.

 Millar v. Taylor, 4 Burr. 23 32.

 Mackintosh v. Townsend, 16 Ves, 337.

 By the king in Council on rejecting Lord Baltimore’s claim of certain Port Duties; Bacon’s Law of Maryland, 1692, ch. 17, note.

 The King v. Waddington, 1 East 148, 158; The Attorney-General v. The Cast Plate Glass Company, 1 Anstr. 39; Cameron v. Cameron, 7 Cond. Chan. Rep. 374; The people v. Utica Insurance Company, 15 Johns. Rep. 380, 394.

 1 Blac. Com. 61; New River Company v. Graves, 2 Vern. 431; Curling v. Chalklen, 3 M. & S. 510.

 Silk v. Prime, 1 Bro. C. C. 138. n.

 Hale de Port-Maris, 46.

 Malham’s Naval Gaz. v. Exeter.

 Rees’ Cyclo. art. Canal.

 Hale de Jure Maris, 16, 34.

 Rees’ Cyclo. art. Canal.

 Hale de Port. Maris, 86, 23 Hen. 8, c. 12.

 Oddy’s Commerce, b. 5, c. 3.

 Hale de Jure Maris 26, 7 Jac. 1, c. 18.

 Rees’ Cyclo. art. Canal.

 Rees’ Cyclo. art. Canal.

 Per Latrobe, Report of A. Gallatin, Secretary of the Treasury on Roads and Canals, 1808, page 87.

 1824, ch. 79.